## STATE OF CONNECTICUT *v.* CARLOS FIGUEROA
## (15104)

Peters, C. J., and Callahan, Berdon, Norcott and Katz, Js.

Argued May 31—decision released August 15, 1995

*Temmy Ann Pieszak,* assistant public defender, for the appellant (defendant).

*David J. Sheldon,* deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Warren Maxwell,* senior assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant was convicted, after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1),[1] kidnapping in the

_____

[1] General Statutes § 53a-70 provides in relevant part: "Sexual assault in the first degree: Class B felony: One year not suspendable. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

first degree in violation of General Statutes § 53a-92 (a) (2),[2] and robbery in the second degree in violation of General Statutes § 53a-135 (a) (2).[3] The defendant appealed from the judgment of conviction to this court, pursuant to General Statutes § 51-199 (b) (3).[4] We affirm the judgment of the trial court.

From the evidence presented at trial, the jury reasonably could have found the following facts. In the early morning hours of January 1, 1984, the victim[5] was seated in her car outside of a friend's home in the city of Hartford when an individual, later identified by the victim as the defendant, opened her passenger side door and forcibly entered the vehicle. The defendant placed a knife to the victim's throat, ordered her into the passenger seat, got into the driver's seat and drove away at a high rate of speed. During the thirty minute ride,[6] the defendant cursed at the victim, told her to keep her

[2] General Statutes § 53a-92 provides in relevant part: "Kidnapping in the first degree: Class A felony. (a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function. . . ."

[3] General Statutes § 53a-135 provides in relevant part: "Robbery in the second degree: Class C felony. (a) A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and . . . (2) in the course of the commission of the crime or of immediate flight therefrom he or another participant in the crime displays or threatens the use of what he represents by his words or conduct to be a deadly weapon or a dangerous instrument. . . ."

[4] General Statutes § 51-199 provides in relevant part: "(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[5] Pursuant to General Statutes § 54-86e, the names of sexual assault victims are confidential.

[6] The victim testified that she "felt like" the car was traveling eastbound on Interstate 84.

head down and not to look where they were going, and struck her several times.

The defendant eventually parked the car in an area near a gray barn in a tobacco field. He then ordered the victim out of the car. When she refused to leave the car, he ordered her into the back seat, where he began to disrobe her. When the victim expressed a fear that the defendant would rip her clothing, he allowed her to remove her own clothing. During this process, she lost a red leather belt with a distinctive belt buckle in the shape of a fish.

The defendant then sexually assaulted the victim for approximately twenty to thirty minutes. Initially, the defendant forced her to have vaginal intercourse and then, when she refused to perform oral sex on him, the defendant compelled her to have anal intercourse. After repeated assaults, both parties dressed themselves. While dressing, the defendant took the victim's gold chain, which was worth approximately $600. Because the chain had been a gift from her father and was of great sentimental value, she asked the defendant to take her car instead of the chain, but the defendant refused, stating that he needed the chain to buy drugs.

Thereafter, the defendant drove the victim back to Hartford. During the ride, the victim attempted to study the defendant's face. At that time, she was sitting in the passenger seat, approximately one and one-half feet away from the defendant. Upon arriving back in Hartford, the defendant parked the victim's car on Huntington Street and fled on foot. The victim then went to a friend's house and, later that evening, went to Mount Sinai Hospital for treatment. She reported the crimes to the police on January 3, 1984.

On March 20, 1984, the victim accompanied two investigating officers, Hartford Detective Mildred Wertz and State Trooper William Finegan, in an attempt to

locate the tobacco field where the assault had taken place. During the trip, the victim identified an area near a gray barn at the Culbro tobacco farm in Ellington as the place where the assault had occurred. In addition, she identified a red belt, found by an employee of the tobacco farm near the barn, as the belt she had lost during the attack. The defendant had been employed at the tobacco farm during July and August, 1983.

In September, 1984, the victim positively identified the defendant from an array of photographs shown to her at the police station. Thereafter, an arrest warrant was issued for the defendant (September, 1984 warrant), but he could not be found. The defendant was considered a fugitive from 1984 until 1990, when he was located in New York City, at which time a new warrant was issued for his arrest. See part V of this opinion.

At trial for the charges relating to the victim, the defendant maintained that he was innocent of abducting and assaulting the victim and claimed that, at the time of the incident, he had been celebrating the New Year's Eve holiday with friends and relatives throughout the entire night and early morning hours.[7]

On appeal, the defendant claims that the trial court improperly: (1) denied his motion to suppress the victim's identification of him as the perpetrator; (2) admitted evidence of uncharged misconduct; (3) unfairly marshaled the evidence in its instructions concerning the uncharged misconduct; (4) denied the defendant's request for an adverse inference instruction regarding the destruction of an article of the victim's clothing; (5) denied his motion to dismiss the charges against him predicated on the grounds that the service of the warrant had been untimely; and (6) commented in its

---

[7] Indeed, the defendant's aunt testified that the defendant was at her home when she went to bed at 5 a.m.

instructions explaining the principle of reasonable doubt. We address and reject each of these claims seriatim.

## I

The defendant first claims that the trial court improperly denied his motion to suppress the victim's September, 1984 identification of him. The defendant argues that the identification was tainted by suggestive procedures and was not reliable. We disagree.

The following additional facts are relevant to our resolution of this issue. In December, 1992, the trial court held a hearing on the defendant's motions to suppress the victim's identification and to preclude the state from introducing evidence of uncharged misconduct. See part II of this opinion. At the hearing, the victim testified at length concerning her opportunity to observe her assailant and her subsequent identification of the defendant as her assailant. She testified that she had obtained a good look at her assailant, particularly during the ride back to Hartford.[8] She also testified that on January 3, 1984, she had given the police a description of the man who had sexually assaulted her.

The events between the victim's initial description of her assailant on January 3, 1984, and her identifica-

---

[8] The victim testified as follows:

"[Assistant state's attorney]: Let's back up for a minute. Throughout this ordeal, especially on the ride home, did you get a good look at this man?

"A. Yes.

"Q. How—what part of his person were you looking at or observing?

"A. His face, the right side of his face.

"Q. And how close were you to him at any given point?

"A. Maybe a foot-and-a-half.

"Q. All right. And was it dark out?

"A. Yeah. Well, it was still kind of dark out, but, like, with the city lights, I—you know, he had my head down like this. I kept trying to—you know, like, with the halogen lights and everything, I was getting a better look at him on the way back—

"Q. All right. And you did—

"A. —and trying to observe different marks on his face and everything."

tion of the defendant in September, 1984, are unclear. The victim testified that, on one or more occasions, in January and March, 1984,[9] she had been shown photographs by the police for the purpose of identifying her assailant. She also testified that prior to September, 1984, she had identified the defendant from photographs shown to her by the police, even though she had never signed the back of a photograph signifying a positive identification.[10] Contradicting the victim's testimony, however, was a March, 1984 report by Wertz stating that the victim had been shown twelve photographs of Hispanic males, including the defendant, but that the "complainant was unable to make an identification." The victim also testified that at some point she saw a newspaper article from The Journal Inquirer, dated April 7, 1984, reporting that the defendant had sexually assaulted a Betty Doe[11] on February 19, 1984. The article included a photograph of the defendant.

In September, 1984, the victim identified the defendant as her attacker from an array of photographs. She acknowledged this identification by signing and dating the back of his photograph. At trial, the victim testified that in September, 1984, she was "positive" the defendant was her assailant. She stated that her identification of the defendant was not through the newspaper article, but rather was based solely on her memory and that

[9] The victim's recollection at trial of the exact dates in January and March, 1984, that she had been shown photographs was uncertain. She testified that on January 3, 1984, after reporting the incident to the police, she perused albums of mug shots. She testified that she remembered identifying one photograph, but she had not signed it. She also testified that on January 4, 1984, Wertz had shown her a photographic array and that she had identified one picture as depicting her assailant, but had not signed it. She did not recall viewing a photographic array in March, 1984.

[10] The victim testified that she had known of the defendant's name prior to her September, 1984 identification because she had identified his photograph in an earlier array for Wertz and had asked his name.

[11] Betty Doe is a fictitious name. See footnote 5.

she had "never [been] more positive in [her] life" of her identification.

At trial, the defendant filed a motion to suppress the victim's prior identification of him, arguing that the identification procedure was not sufficiently reliable under the totality of the circumstances to be admissible. The state argued that the victim's identification was reliable because just two days after the attack, she had given the police an accurate description of her assailant, and therefore, the evidence should be admitted.[12]

Although the trial court recognized that the identification procedure might have been suggestive, it concluded

---

[12] The defendant's motion to suppress was heard at the same time as his motion to preclude the misconduct evidence that the defendant had sexually assaulted Betty Doe because the issues, according to the trial court, were "intertwined." The state buttressed its argument against the motion to suppress with evidence of the similarities between the assaults of the victim and Betty Doe. "If you take that into conjunction with [the uncharged misconduct], then I think that fortifies and rubberstamps the state's position that the reliability of the identification has been satisfied here."

At oral argument before this court, the defendant claimed, for the first time, that the trial court had improperly relied on the evidence of uncharged misconduct in support of its conclusion that the victim's identification of the defendant was sufficiently reliable. Although we find that the trial court's conclusion is adequately supported by the record, regardless of the evidence of uncharged misconduct, we note that any reliance by the trial court on the uncharged misconduct in deciding the motion to suppress the identification was misplaced.

The factors to be considered in a motion to suppress a pretrial identification "are not required to be present seriatim for an identification to be found reliable"; *State* v. *Ramsundar*, 204 Conn. 4, 11, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987); *United States* v. *Merkt*, 794 F.2d 950, 958 (5th Cir. 1986), cert. denied, 480 U.S. 946, 107 S. Ct. 1603, 94 L. Ed. 2d 789 (1987); *United States* v. *Woolery*, 740 F.2d 359, 360–61 (5th Cir. 1984), cert. denied, 469 U.S. 1208, 105 S. Ct. 1172, 84 L. Ed. 2d 322 (1985); rather, the inquiry must be "to determine whether, before the imprint arising from the unlawful identification procedure, there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any, assistance from its successor." (Internal quotation marks omitted.) *State* v. *Reddick*, 224 Conn. 445, 468, 619 A.2d 453 (1993).

Thus, evidence regarding the uncharged misconduct, which may be admissible to prove the perpetrator's identity, was irrelevant to the issue of whether the victim's identification was reliable.

that, under the totality of the circumstances, the identification was sufficiently reliable to be admissible, regardless of whether the victim had identified the defendant's photograph in either the January or March, 1984 photographic arrays.[13]

During briefing, the defendant filed a motion for an articulation as to the basis of the trial court's decision denying his motion to suppress the identification.[14] See Practice Book § 4051.[15] The trial court granted the

[13] The only reference that the trial court made to the alleged January and March identifications in its oral decision denying the defendant's motion to suppress was as follows: "[R]ecognizing that that situation does bring up the question of suggestivity, but whether or not her present identification is such that indicates reliability sufficient to go to a jury. When you take the totality of the circumstances produced here, the Court could come to that conclusion from this standpoint: Suppose no identification was made in January or in March and the victim does see a person whose picture is in the paper, or he's standing on the street, and says that's the person and then is given a photo array. And through the photo array the victim doesn't know about comparison of similarities between the two offenses."

[14] Specifically, the defendant asked whether the trial court had found that the victim had identified the defendant in January or March, 1984. In support of his motion, the defendant argued that the state had presented the identification issue on appeal "in a way that assumes that the victim consistently identified the defendant in January, March and September 1984" despite the fact that the oral decision contained no express findings of fact.

[15] Practice Book § 4051 provides in relevant part. "Any motion seeking corrections in the transcript or the trial court record which depend on proof of matters not of record or seeking an articulation or further articulation of the decision of the trial court shall be determined by the judge of the trial court whence the appeal is taken or the reservation is made. The trial court may make such corrections or additions as are necessary for the proper presentation of the preliminary statement of issues or for the proper presentation of questions reserved; or the trial court may approve a stipulation of counsel that such a correction or addition be made, provided the motion or stipulation is presented before the appeal is ready to be assigned for hearing and only by leave of the supreme court or the appellate court thereafter. The action of the trial judge as regards such a correction or addition may be reviewed by the court in which the appeal is pending under Sec. 4054. Nothing herein is intended to affect the existing practice with respect to opening and correcting judgments and the records on which they are based.

"Corrections made before the record is prepared shall be included in it. If the record has been prepared, the appellate clerk may prepare a supplemental record, to be distributed in the same way as the original record."

defendant's motion. In its articulation, the trial court referred to the victim's testimony regarding her identifications of her assailant prior to September, 1984, but made no finding whether the victim had identified the defendant in January or March, 1984.[16]

The defendant subsequently amended his appeal, moved for a review of the articulation and for permission to file a supplemental brief to address the validity of the trial court's articulation. We granted the defendant's motion for review, but denied the relief requested therein without prejudice, and granted his motion to file supplemental briefs.

In his supplemental brief, the defendant claimed that the trial court's articulation violated *State* v. *Wilson*, 199 Conn. 417, 507 A.2d 1367 (1986), and must be stricken from the record.[17] In *Wilson*, we concluded that a trial court's articulation must be stricken from the record if it modifies the substance of the original decision, more than four months after rendering judgment. Id., 436–37. We decline to address this issue, however, because we conclude that the trial court's original memorandum of decision is sufficient to uphold the admissibility of the victim's identification of the defendant.

---

[16] The trial court's articulation stated that, with regard to the victim's testimony that she had identified her assailant on occasions prior to September, 1984, "her testimony that in January she identified her assailant is corroborated by the fact that the defendant's photograph was part of the array presented to her in March. I cannot discount [the victim's] testimony that she identified the same person in March because I do not know the factors which entered into [Detective] Wertz's judgment that [the victim] was unable to make an identification."

[17] In addition, the defendant claims that even if the articulation is valid under *Wilson*, the trial court improperly denied: (1) the motion to suppress on the basis of its clearly erroneous findings of fact; (2) the motion to suppress on the basis of its legally and logically incorrect reasoning; (3) the defendant the opportunity to adduce evidence of the victim's alleged misidentification of the defendant at the suppression hearing; and (4) the motion to dismiss because of untimely service of a warrant. Because we conclude that, even if we were to strike the articulation, the trial court's original decision to deny the motion to suppress was proper, we do not reach these issues.

The standard by which we·review a trial court's decision to admit evidence of identification is well settled. "[W]e will reverse the trial court's ruling [on evidence] only where there is abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling." (Citation omitted.) *State* v. *Mooney*, 218 Conn. 85, 131, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). Because the inquiry into whether evidence of pretrial identification should be suppressed "contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error. *State* v. *Mitchell*, 204 Conn. 187, 203, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). Because the issue of the reliability of an identification involves the constitutional rights of an accused, [however] we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. *State* v. *Gordon*, 185 Conn. 402, 416, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State* v. *Frazier*, 185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982); see *Culombe* v. *Connecticut*, 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961)." *State* v. *Howard*, 221 Conn. 447, 454, 604 A.2d 1294 (1992).

"It is well settled that [i]n determining whether a pretrial identification procedure violated a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have

been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. *State* v. *Tatum*, 219 Conn. 721, 727, 595 A.2d 322 (1991), quoting *State* v. *Theriault*, 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see also *State* v. *Ramsundar*, 204 Conn. 4, 10, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987). To prevail in his claim, the defendant must demonstrate that the trial court erred in both of its determinations regarding suggestiveness and reliability of identifications in the totality of the circumstances. . . . *State* v. *Hinton*, [196 Conn. 289, 293, 493 A.2d 836 (1985).] *State* v. *Mayette*, 204 Conn. 571, 581, 529 A.2d 673 (1987). *State* v. *Pollitt*, 205 Conn. 132, 162, 531 A.2d 125 (1987)." (Internal quotation marks omitted.) *State* v. *Wooten*, 227 Conn. 677, 685, 631 A.2d 271 (1993).

We first address the defendant's claim that the identification procedures were unnecessarily suggestive due to the victim's repeated exposure to the defendant's photograph. "An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. *State* v. *Outlaw*, [216 Conn. 492, 501, 582 A.2d 751 (1990)]; *State* v. *Milner*, 206 Conn. 512, 534–35, 539 A.2d 80 (1988); *State* v. *Boscarino*, 204 Conn. 714, 725, 529 A.2d 1260 (1987)." *State* v. *White*, 229 Conn. 125, 161–62, 640 A.2d 572 (1994). In the past, we have held that "[t]he presentation of an array of several photographs to witnesses, including that of the suspect, does not constitute an impermissibly suggestive pretrial identification procedure in the absence of any unfairness or other impropriety in the conduct of the exhibit." (Internal quotation marks omitted.) Id., 162. We have also "recognized that pictorial recurrence can be suggestive in that it increases the risk of misidentification." *State* v. *McKnight*, 191 Conn. 564, 572, 469 A.2d 397 (1983). Therefore, although repeated photographic arrays are not per se suggestive,

there are limits on this procedure for purposes of identification. Because we conclude that the identification in this case was reliable under the totality of the circumstances, however, we need not decide whether the victim's identification was unnecessarily suggestive. See *State* v. *Wooten,* supra, 227 Conn. 687; *State* v. *Crosswell,* 223 Conn. 243, 268, 612 A.2d 1174 (1992); *State* v. *Payne,* 219 Conn. 93, 108, 591 A.2d 1246 (1991).

"[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). "To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, we must weigh the corrupting effect of the suggestive procedure in light of certain factors such as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [that person's] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation . . . . *State* v. *Theriault,* supra, [182 Conn.] 373–74; *Manson* v. *Brathwaite,* supra, 114; *State* v. *Evans,* 200 Conn. 350, 356, 511 A.2d 1006 (1986)." (Internal quotation marks omitted.) *State* v. *Wooten,* supra, 227 Conn. 687–88.

In the present case, the victim had ample opportunity to view her assailant both in the car and during the assault. She was in close proximity to her assailant for at least ninety minutes. Further, the victim testified that throughout the ordeal, especially on the ride home, she had taken care to get a "good look" at her assailant and that she had tried to memorize his facial features. She testified that, while sitting in the passenger seat, an estimated distance of one and one-half feet, she had been "trying to observe different marks on his face and everything."

In addition, two days after the assault the victim went to the police station and gave a complete description of her assailant. She described her assailant as a Hispanic male, approximately twenty-five to thirty-two years old, 5 feet 7 inches to 5 feet 8 inches, with short dark kinky hair. Furthermore, she described him as having a medium build, a round face and a dark, ruddy complexion. Although she had seen only the right side of his face, she remembered seeing a little line on his face. She described him as having a wide, flat nose with a flared nostril, and a moustache. Finally, she stated that he spoke English with an accent and was nicely dressed in a suit, tie and dress shoes.

The defendant argues that the victim's description of the defendant was too general and that it could apply to any number of individuals. We disagree with the defendant's characterization. As the United States Supreme Court observed, "[s]he was no casual observer, but rather the victim of one of the most personally humiliating of all crimes. Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust[18] but was more than ordinarily thorough." *Neil* v. *Biggers*, 409 U.S. 188, 200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). Furthermore, in September, 1984, the victim testified that she was "absolutely, 100 percent, sure" that the defendant was the man who had assaulted her.

Finally, the defendant argues that the victim's identification of the defendant is unreliable because the time between the crime, January 1, 1984, and her September, 1984 identification was excessive. In *State* v. *Parker*, 197 Conn. 595, 600, 500 A.2d 551 (1985), we stated that,

[18] Marcel Proust, a French author who lived from 1871 to 1922, is best known for his novel Remembrance of Things Past. He has been referred to as "a meticulous Craftsman, detailed and realistic in his descriptions." 3 F. Magill, Cyclopedia of World Authors (Rev. Ed. 1974) pp. 1446–48.

"the ten month period between the identification and [the victim's viewing of her assailant] was [not] so long as to render her identification unreliable." See also *State* v. *Liptak*, 21 Conn. App. 248, 253, 573 A.2d 323, cert. denied, 215 Conn. 809, 576 A.2d 540 (1990) (in-court identification occurring eight months after crime is not impermissibly distant in time). In the present case, nine months had passed between the crime and the identification. We conclude that the passage of nine months, in and of itself, did not render the victim's identification unreliable.

As the trial court recognized,[19] the defendant could have explored any weaknesses in the victim's identification during trial. Any uncertainty on the witness' part goes toward the weight of the evidence rather than the admissibility. *State* v. *Mayette*, supra, 204 Conn. 584. The weaknesses of identifications can be explored on cross-examination and during counsel's final arguments to the jury. *State* v. *Kemp*, 199 Conn. 473, 478, 507 A.2d 1387 (1986). It is a matter for the jury to determine, after cross-examination, what weight to accord the witness' testimony. *State* v. *King*, 216 Conn. 585, 592, 583 A.2d 896 (1990), on appeal after remand, 218 Conn. 499, 591 A.2d 813 (1991); *State* v. *Rawls*, 198 Conn. 111, 118, 502 A.2d 374 (1985). "The exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect. . . . Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that

---

[19] In its memorandum of decision the trial court stated: "And I know, in the nature of this case, that defense counsel has made the Court aware of evidence that can be used to indicate the—to a fact finder the lack of reliability from the standpoint of introduction of certain evidence to test her credit as to identification."

they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Citation omitted; internal quotation marks omitted.) *State* v. *Ramsundar*, supra, 204 Conn. 13.

We conclude that the trial court reasonably could have found, from the totality of the circumstances, that the victim's September, 1984 identification of the defendant was sufficiently reliable to be admissible. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress.

## II

The defendant next claims that the trial court improperly admitted as evidence of a signature crime the testimony of Betty Doe regarding uncharged misconduct. Because we conclude that this evidence was relevant to the identity of the victim's assailant and its probative value outweighed its prejudicial effect, we disagree.

The following facts are relevant to our resolution of this issue. Betty Doe testified that she had been sexually assaulted on February 19, 1984, approximately six weeks after the assault on the victim. She testified that at approximately 6:30 p.m. that evening, while stopped at a phone booth in Ellington, she had been abducted at knife point and had been forced into the passenger seat of her own car. Her assailant, who was later determined to be the defendant,[20] held the knife to her throat and ordered her not to look at him. The defendant then drove Betty Doe's car for approximately fifteen minutes, to an area near a barn located in a tobacco field. The defendant removed Betty Doe's clothes and he removed his pants. He then forced her to perform oral sex on

---

[20] A fingerprint, lifted from the cardboard box used to free Betty Doe's car from the mud, led to the arrest of the defendant for the sexual assault of Betty Doe. Because he pleaded guilty to that sexual assault, and was sentenced to eighteen years incarceration, there is no question as to the reliability of this misconduct evidence.

him. When the act was completed, the defendant attempted to fondle Betty Doe. She protested, the defendant abandoned his attempt and they both got dressed. The defendant then tried to depart in Betty Doe's car, but realized that the car was stuck in the mud. While the defendant was engaged in attempting to free the car, Betty Doe was able to escape to a nearby house and call the police. Betty Doe described her assailant as a Hispanic man, approximately 5 feet 6 inches and thirty years old, with a moustache, wiry hair and a solid build. She testified that he spoke English clearly with a Spanish accent and was well dressed in slacks and a leather jacket.

At trial for the charges related to the victim, the state offered Betty Doe's testimony as evidence of the defendant's identity and to counter defense witness testimony supporting the defendant's alibi, namely, that he had been at a friend's home at the time of the assault. The defendant opposed the admission of any evidence regarding the uncharged misconduct, contending that the two assaults were not similar and that the evidence was highly prejudicial.

"As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. *State* v. *Harris*, 147 Conn. 589, 599, 164 A.2d 399 [1960]. *State* v. *Fredericks*, 149 Conn. 121, 124, 176 A.2d 581 (1961); McCormick, Evidence (2d Ed. 1972) § 190; 1 Wharton, Criminal Evidence (13th Ed.) § 170. The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. See *State* v. *Williams*, 190 Conn. 104, 108, 459 A.2d 510 (1983); *State* v. *Howard*, 187 Conn. 681, 684, 447 A.2d 1167 (1982); *State* v. *Ibraimov*, 187 Conn. 348, 352, 446 A.2d 382 (1982); *State* v. *Barlow*, 177 Conn. 391, 393, 418 A.2d 46 (1979); 1 Wigmore, Evidence (3d Ed.) §§ 215–18."

(Internal quotation marks omitted.) *State* v. *Braman*, 191 Conn. 670, 675, 469 A.2d 760 (1983). The fact that such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and material. Id.; *State* v. *Ibraimov*, supra, 352; *State* v. *Hauck*, 172 Conn. 140, 144, 374 A.2d 150 (1976); *State* v. *Marshall*, 166 Conn. 593, 600, 353 A.2d 756 (1974). Such evidence is admissible for other purposes, such as to show intent, an element in the crime, identity, malice, motive or a system of criminal activity. *State* v. *Ibraimov*, supra, 352; *State* v. *Falby*, 187 Conn. 6, 23, 444 A.2d 213 (1982); *State* v. *Brown*, 169 Conn. 692, 701, 364 A.2d 186 (1975).

Our analysis of whether evidence of the uncharged misconduct is admissible is two-pronged. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions to the propensity rule. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crimes evidence. *State* v. *Braman*, supra, 191 Conn. 676; *State* v. *Howard*, supra, 187 Conn. 685; *State* v. *Ibraimov*, supra, 187 Conn. 352; *State* v. *Onofrio*, 179 Conn. 23, 28–29, 425 A.2d 560 (1979).

The primary responsibility for conducting the prejudicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. *State* v. *Morowitz*, 200 Conn. 440, 446, 512 A.2d 175 (1986); *State* v. *Mandrell*, 199 Conn. 146, 152, 506 A.2d 100 (1986); *State* v. *Shindell*, 195 Conn. 128, 136, 486 A.2d 637 (1985); *State* v. *Johnson*, 190 Conn. 541, 548–49, 461 A.2d 981 (1983); *State* v. *Tucker*, 181 Conn. 406, 416, 435 A.2d 986 (1980); 1 F. Wharton, Criminal Evidence (13th Ed. 1972) § 241. "[W]e will indulge in every reasonable presumption in favor of the trial court's ruling." *State* v. *Mooney*, supra, 218 Conn. 131; *State* v. *Sierra*, 213 Conn. 422, 435, 568 A.2d 448 (1990); *State* v. *Braman*, supra, 191 Conn. 677; *State*

v. *Johnson,* supra, 549; *State* v. *Howard,* supra, 187 Conn. 685; *State* v. *Ryan,* 182 Conn. 335, 337, 438 A.2d 107 (1980).

Under the first prong of our analysis, we conclude that the trial court did not abuse its discretion in admitting evidence of the sexual assault on Betty Doe because the evidence was relevant to the identity of the victim's assailant. "The first threshold for the use of evidence of other crimes or misconduct on the issue of identity is that the methods used be sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other." (Internal quotation marks omitted.) *State* v. *Sierra,* supra, 213 Conn. 430; "McCormick points out that in proffering other crime evidence [t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused . . . much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature."(Internal quotation marks omitted.) *State* v. *Braman,* supra, 191 Conn. 677; C. McCormick, supra, § 190, p. 449. In order to determine if this threshold criterion for admissibility has been met, we must examine the proffered evidence and compare it to the charged offenses. *State* v. *Sierra,* supra, 430.

A comparison of the two crimes discloses the following similarities: (1) both offenses occurred at night, to lone women; (2) in each instance, the assailant kidnapped the victim and held a knife to her throat; (3) both victims were forced into the passenger seat of their own cars and were warned not to look at the assailant; (4) the assailant drove both of the victims' cars for a considerable period of time; (5) both assaults occurred near a particular barn at the Culbro tobacco field,[21]

---

[21] The parties stipulated that the two assaults had not occurred in the exact location, but rather in two separate locations, both in close proximity to barn number 227 on the Culbro tobacco farm.

where the defendant had previously worked; (6) in each instance, the assailant attempted to remove the victim's clothes; (7) both assaults involved a demand for oral sex; (8) in each instance, the assailant abandoned an attempt to perform or request for a specific sex act when the victim resisted; (9) each victim described her assailant as an Hispanic male with similar features; and (10) both assaults occurred within weeks of each other.

"[T]he fact that some of the similarities between the offenses were legal or relatively common occurrences when standing alone does not, as the defendant argues, negate the uniqueness of the offenses when viewed as a whole. It is the distinctive combination of actions which forms the 'signature' or modus operandi of the crime; *State* v. *Esposito*, [192 Conn. 166, 171–72, 471 A.2d 949 (1984)]; *State* v. *Braman*, supra, [191 Conn.] 679; and it is this 'criminal logo' which justifies the inference that the individual who committed the first offense also committed the second. *State* v. *Mandrell*, supra, [199 Conn.] 151–52; *State* v. *Esposito*, supra, 171." *State* v. *Morowitz*, supra, 200 Conn. 445." 'The process of construing an inference of [i]dentity . . . consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated. The process thus corresponds accurately to the general principle of relevancy.' 2 Wigmore, Evidence (Chadbourn Rev. 1979) § 411." *State* v. *Braman*, supra, 679.

Under these facts and circumstances, we conclude that the trial court did not abuse its discretion in allowing Betty Doe's testimony because the characteristics of the two assaults were sufficiently distinctive and unique to be "like a signature," and thus the defendant's

participation in the sexual assault of Betty Doe was highly probative on the issue of the identity of the victim's assailant.

The defendant's reliance on *State* v. *Ibraimov,* supra, 187 Conn. 348, is misplaced. "The young victim in *Ibraimov* had entered her assailant's automobile in order to respond to his request for directions. The assailant then drove the victim to a remote area where he sexually assaulted her. Subsequently, the assailant picked up another young female, who had been hitchhiking, and offered her money to have sexual relations with him. Because the central issue at trial in *Ibraimov* was the identity of the assailant, the state proffered testimony of a sixteen year old girl [who], more than two months after the date of the crimes charged . . . had entered the defendant's automobile when he offered her a ride. This witness, who had met the defendant previously, was driven by him to a remote area, where he made sexual advances and offered her money, marijuana and something to drink. . . .We held that the admission of this evidence, because of its prejudicial character, had been erroneous. The assailant's crime and the defendant's subsequent misconduct could not be deemed signature offenses, we concluded, because [t]he number of times that young girls have been induced to enter automobiles upon similar pretexts and with similar consequences is just too great according to general experience to narrow the circle of possible suspects significantly." (Citation omitted; internal quotation marks omitted.) *State* v. *Pollitt,* 205 Conn. 61, 70, 530 A.2d 155 (1987).

Likewise, the defendant's reliance on *State* v. *Sierra,* supra, 213 Conn. 422, is misplaced. *Sierra* involved a female victim who had been threatened with a knife, handcuffed to a motel sink and robbed by the defendants, who then stole her car. Her car was later found in the Bronx. The state was permitted to introduce evidence to show that, two days earlier, the defendants had used a knife to commit an armed robbery of a taxi driver, wherein the defendants had forced the driver

out of the taxi and had driven away. The taxi was later discovered in the Bronx, although not in close proximity to where the car stolen in the motel incident had been found. In concluding that the trial court improperly admitted evidence of the taxi robbery as relevant to the issue of identity, we stated, "[t]he number of times two men take items of value from individuals, using a knife and threats to accomplish their task, flee in a car so taken, and then abandon the car in a city near the scene of the crime is just too great according to general experience to narrow the circle of possible suspects significantly . . . [and] do not meet the threshold criterion for admissibility . . . ." (Citation omitted; internal quotation marks omitted.) Id., 432.

The similarities in the present case are far more significant and compelling than those in *Ibraimov* and *Sierra* and are comparable to other cases in which the exercise of the trial court's discretion in admitting evidence of "signature" crimes has been upheld. See *State* v. *Kulmac*, 230 Conn. 43, 644 A.2d 887 (1994); *State* v. *Pollitt*, supra, 205 Conn. 61; *State* v. *Morowitz*, supra, 200 Conn. 440; *State* v. *Mandrell*, supra, 199 Conn. 146; *State* v. *Crosby*, 196 Conn. 185, 491 A.2d 1092 (1985); *State* v. *Howard*, supra, 187 Conn. 681.

Having determined that the proffered evidence was relevant to a proper purpose, we must next review whether the probative value of the evidence outweighed its prejudicial impact. *State* v. *Braman*, supra, 191 Conn. 676; *State* v. *Moynahan*, 164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973); *State* v. *Holliday*, 159 Conn. 169, 173, 268 A.2d 368 (1970).

Because the trial court weighed the probative value of the evidence against its prejudicial effect and gave the jury specific limiting instructions regarding the proper purpose of the evidence, it is reasonable to infer that

the trial court concluded that the probative value of the evidence outweighed any prejudicial effect the evidence might have. The striking similarity between the two crimes rendered the evidence highly probative. *State* v. *Morowitz*, supra, 200 Conn. 447. The trial court was aware of the potential prejudicial effect of the evidence and carefully instructed the jury concerning the limited use for which the evidence was being admitted. See id.; *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 193, 510 A.2d 972 (1986); *State* v. *Braman*, supra, 191 Conn. 682. In doing so, the court expressly related to the jury that "[c]ertain evidence was offered by the State for the purpose of identification of the defendant as the perpetrator of the crimes alleged herein. That is the evidence offered by Betty Doe as to the assault upon her on February 19th, 1984. . . . This evidence is not offered and cannot be offered to show that the defendant had a propensity to commit [a] crime or that since he committed a crime like the one alleged here that he must have committed this one. It is offered to show similarities between the misconduct to Betty and the crime charged here. . . . However, if you do not find that the similarities are strong enough to be like a signature or fingerprint you must exclude the evidence from your minds and it is to have no influence on your decision." The state's attorney followed the same course and referred only twice to the "signature" evidence and on both occasions for the limited purpose for which it was being offered.[22] See *State* v. *O'Neill*, 200 Conn. 268, 275, 511 A.2d 321 (1986).

In view of the inherently imprecise nature of the balancing process and the limiting instructions given to the

[22] In closing arguments, the state noted, "[b]ut the question is, are the similarities sufficient enough on a comparison basis for you to draw an inference that because of the similarities the identification of the assailant is the same in Betty's case as it was in [the victim's] case." The state further noted, in rebuttal, that "when it comes to similarities the question is are there sufficient similarities so as to make the identification of one assailant the same as the other."

jury, we are satisfied that the trial court did not abuse its discretion in concluding that the probative value of the evidence exceeded its prejudicial effect. Accordingly, we conclude that there was no abuse of the trial court's discretion in its decision to admit Betty Doe's testimony.

## III

The defendant next claims that the trial court unfairly marshaled the evidence during its explanation of the use of evidence regarding the assault on Betty Doe in violation of his federal and state constitutional rights to due process. Specifically, the defendant claims that the trial court improperly mentioned the similarities between the assaults on the victim and Betty Doe and ignored the dissimilarities.[23] Although this claim was

[23] The trial court's instruction on the uncharged misconduct was as follows: "Certain evidence was offered by the State for the purpose of identification of the defendant as the perpetrator of the crimes alleged herein. That is the evidence offered by Betty Doe as to the assault upon her on February 19th, 1984. The assaulter who she identified in court as the defendant, along with the testimony of ex-Trooper Finegan that he had received a cardboard box from Betty which she testified the defendant had used to attempt to free Betty's car from the mud in a tobacco field. Trooper Finegan testified that he dusted for fingerprints on the box and discovered a full and several partials which he brought to the State Police Forensic Laboratory in Meriden. And Mr. O'Brien testified that he had analyzed and matched the latent print to the left thumbprint of the defendant. Mr. Finkle corroborated the match in his testimony. This evidence is not offered and cannot be offered to show that the defendant had a propensity to commit crime or that since he committed a crime like the one alleged here that he must have committed this one. It is offered to show similarities between the misconduct to Betty and the crime charged here. You first must determine whether you believe that the misconduct against Betty occurred. If you find that the defendant did perpetrate the misconduct against Betty you must then examine the similarities between the two events to determine whether such similarities are so unique and distinctive as to reasonably believe that they were like a signature or fingerprint so as to demonstrate that the same person committed both crimes or both misconducts. It goes without saying, of course, that if you don't believe [the victim], and therefore, that the event she testified happened on January 1st, 1984, did not occur then you need not make the comparison. On the other hand, if you do believe the event occurred you must make the comparison. However, if you do not find that the similarities are strong enough to be like

not properly preserved at trial, the defendant seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[24] We conclude that the defendant's claim fails the third prong of the *Golding* review.

"The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which they might find to be established . . . and therefore, we have stated that a charge must go beyond a bare statement of accurate legal principles to the extent of indicating to the jury the application of those principles to the facts claimed to have been proven." (Citation

a signature or fingerprint you must exclude the evidence from your minds and it is to have no influence on your decision. The similarities that you may consider that have been produced in evidence that two similar young women with a motor vehicle was accosted by a male You may also consider the use of a knife to the front of the neck or throat in both cases. You may also consider that they both were abducted in their own car with the male doing the driving and they in the front passenger's seat; that both were told not to look at the male; that both were told to put their heads down so that they could not see where they were going. You may consider whether or not the descriptions given by each, [the victim] and Betty, were similar. And as I recall the testimony of both, that the male was well dressed, that both testified to the demand for oral sex; that the location of the assault, there was evidence that both occurred on Culbro tobacco field; that both testified that they were requested to completely disrobe; that both were requested in the alternative for sexual activity. As I recall, Betty, explained to the male that she was not then presently with birth control present; was given the alternative of vaginal or oral sex; that [the victim], after vaginal sex was requested, for oral sex, and upon refusal the male put the request in the alternative either oral or anal sex; that in both testimonies of [the victim] and Betty there was no testimony of an actual violent act being used at the time to insist on one particular sex act; but the alternatives were offered as if the victims were making the choice in a manner, and therefore, were submitting; the offer after the assault to transport the victims where the defendant would leave."

[24] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40.

omitted; internal quotation marks omitted.) *State* v. *Hernandez*, 218 Conn. 458, 462, 590 A.2d 112 (1991); see *State* v. *Canty*, 223 Conn. 703, 716–17, 613 A.2d 1287 (1992); *State* v. *Shannon*, 212 Conn. 387, 408, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989); *State* v. *Mullings*, 166 Conn. 268, 274, 348 A.2d 645 (1974).

"A trial court often has not only the right, but also the duty to comment on the evidence." *State* v. *Hernandez*, 218 Conn. 461–62; see *State* v. *Lemoine*, 233 Conn. 502, 511–12, 659 A.2d 1194 (1995); *State* v. *Marra*, 222 Conn. 506, 538, 610 A.2d 1113 (1992); *State* v. *James*, 211 Conn. 555, 571, 560 A.2d 426 (1989). To avoid the danger of improper influence on the jury, a recitation of the evidence "should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention." (Internal quotation marks omitted.) *State* v. *Hernandez*, supra, 462. In marshaling the evidence, the court must be careful not to imply any favor or criticism of either side. Id., 463.

To determine whether the court's instructions were improper, we review the entire charge to determine if, "taken as a whole, the charge adequately guided the jury to a correct verdict." *State* v. *Fleming*, 198 Conn. 255, 268–69, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986). "The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Hernandez*, supra, 218 Conn. 465; *State* v. *Tatum*, supra, 219 Conn. 734; see *State* v. *Palmer*, 206 Conn. 40, 46, 536 A.2d 936 (1988). "[I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possi-

ble that the jury [was] misled." *State* v. *Corchado*, 188 Conn. 653, 660, 453 A.2d 427 (1982).

The defendant relies on *State* v. *Hernandez*, supra, 218 Conn. 465, in which we reversed the defendant's conviction because the trial court had "extensively detailed the state's claims and its evidence in support thereof, and little or no reference was made to the defendant's exculpatory evidence and his theory of defense . . . ." Although the trial court in the present case did provide a more detailed account of evidence regarding the similarities between the two assaults, it did discuss the differences between the sexual acts requested and those that were actually performed. In addition, the instruction stated that the jury was not required to accept the similarities between the two sexual assaults as a proven fact, and the trial court accurately instructed the jury that Betty Doe's testimony could be used only in regard to the issue of the identification of the defendant and could not be used to show that he had a propensity to commit crimes. Moreover, the trial court's charge explained in detail the defendant's theory of defense, namely that he was not the perpetrator and could account for his whereabouts at the time of the crime. Indeed, the trial court outlined the exculpatory evidence in support of the defendant's alibi, including recounting the testimony of the defendant's four supporting witnesses.

Finally, the trial court properly instructed the jury that: (1) it was to consider all the evidence in the case and not just that to which the court referred to in its instructions; (2) the court meant to emphasize no particular evidence above any other by its mention of such evidence; (3) the jury's recollection of the facts was that which ultimately counted; (4) the jury's acceptance of the similarities between the assaults must be predicated upon their crediting both the victim's account and Betty Doe's account of their respective assaults; (5) the simi-

larities between the two assaults must be very distinctive; and (6) notwithstanding the defendant's alibi defense, the state bore the burden of proving beyond a reasonable doubt that the defendant committed the crimes charged against him. See *State* v. *Canty*, supra, 223 Conn. 718.

Viewing the charge in its entirety, we conclude that it is not reasonably possible that the jury was misled by the trial court's instructions and thus did not deprive him of his state or federal right to due process. As such, the defendant's claim fails under the third prong of *Golding*. See footnote 24.

IV

The defendant next contends that the trial court improperly denied his request for an adverse inference instruction against the state in light of the state's failure to introduce the victim's belt as evidence. The defendant argues that, because the missing belt ordinarily would have corroborated the victim's identification of the defendant and confirmed the location of the tobacco farm as the scene of both assaults, the jury should have been instructed that it could draw an inference, on the basis of the state's failure to introduce the belt, that the belt would not have corroborated the victim's testimony. We disagree.

The facts relevant to this claim are as follows. At trial, the victim testified that during the sexual assault, she opted to disrobe herself, fearing that the defendant would tear her clothing. In the process, she had lost a wide, red leather belt with a distinctive silver buckle in the shape of a fish. Thomas Kizis, an employee of the Culbro tobacco farm, testified that subsequent to January 1, 1984, he found a red belt matching that description at the farm near barn number 227. Kizis turned the belt over to the state police in March, 1984.

As part of the police investigation, the victim visited the farm on March 20, 1984, and, at that time, identified the belt as her own. The belt was turned over to the Hartford police department and tested for latent fingerprints, but none were found on the belt or belt buckle.[25] Prior to trial, the parties stipulated that in 1990, the Hartford police department had destroyed the belt as a part of a judicially ordered cleanup of all police inventory obtained prior to 1985.[26]

The defendant filed a request that the trial court instruct the jury that it could draw an adverse inference because the state had failed to produce the belt at trial, and that the jury must infer "that [the belt] should favor the defense and be unfavorable to the state."[27] The court denied the defendant's request, reasoning that the unavailability of the belt was not the fault of "police action" and therefore the defendant was not entitled to the requested instruction.[28] The defendant duly excepted to the court's ruling.

---

[25] The parties stipulated that the state police had retrieved latent fingerprints from the inside of the victim's car, but that these records were destroyed as part of the same court order. The defendant sought no adverse inference instruction regarding the fingerprints but claims on appeal that, if the requested instruction had been given, the jury could have applied the inference to the destroyed fingerprints as well.

[26] There is no claim, nor is there any evidence, that the police maliciously destroyed the belt in order to prevent it from being utilized by the defense. See *State* v. *Santangelo*, 205 Conn. 578, 597, 534 A.2d 1175 (1987); *State* v. *Mullings*, 202 Conn. 1, 8–9, 519 A.2d 58 (1987).

[27] The defendant's request to charge was as follows: "During the State's case, you heard testimony from Jane Doe that she lost a belt. As you recall from the testimony from Kizis, a belt was recovered on the Culbro Farm. This belt was never provided at trial because the State admits they destroyed this evidence There is a principle of law that where evidence is within the sole power of one party to present, or when one party has supervision or sole access to such evidence and that evidence is not produced at trial, the other party, in this case, Mr. Figueroa, is entitled to an inference that evidence would have favored the defense and would have been unfavorable to the State."

[28] The trial court stated: "[I]t wasn't police action or State's Attorney's action but action of the court that made the evidence unavailable. But the

The defendant argues that if the adverse instruction had been given, the jurors "might well have used it to discredit the connection . . . between the incident on trial and [the Betty Doe] case." The defendant also argues that the trial court's refusal to give the adverse inference instruction "restrict[ed] the jurors' assessment of [the victim's] credibility."[29]

"The failure to produce [evidence] for trial [that] is available and [that] a party would naturally be expected to [produce] warrants an adverse inference instruction against the party who would be expected to [produce that evidence]. *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 674–75, 165 A.2d 598 (1960). In such a situation there is a logical nexus between the failure to [produce the evidence] and an adverse inference. In other words, it makes sense to infer that the [evidence], had [it been] available . . . would [have been] adverse to the party who would naturally be expected to [produce] that [evidence] but failed to do so." *State* v. *Santangelo*, 205 Conn. 578, 596, 534 A.2d 1175 (1987).

In the present case, however, there is no logical nexus between the inability of the state to produce the belt and an inference that, if it were available, it would be favorable to the defendant and adverse to the state. "An inference to be drawn must be logical and reasonable

State has shown that the evidence is unavailable so that the court's interpretation of the case law including *State* v. *Gonzalez*, [206 Conn. 213, 537 A.2d 460 (1988)], would be that the State having shown it unavailable the defense is not entitled to an adverse inference instruction."

[29] The defendant argues that "[t]he jurors had grounds upon which to doubt [the victim's] identification. They might reasonably have concluded that the lapse of time between the incident and her identification, and between the identification and the trial, lead her to unconsciously fill in details, and thus although she was sincere, she was not a reliable witness. If the jurors had been informed that they could affirmatively find that the belt evidence would have favored the defense, and been unfavorable to the state, the jurors probably would have concluded that any similarities in the [Betty Doe] case and the instant case were insufficient to overcome the defense evidence of alibi and the weaknesses of [the victim's] identification."

and strong enough so that it can be found that it is more probable than not that the fact to be inferred is true. *Reliance Ins. Co.* v. *Commission on Human Rights & Opportunities*, 172 Conn. 485, 490, 374 A.2d 1104 (1977)." (Internal quotation marks omitted.) Id., 597.

The adverse inferences that the defendant claims the jury would have drawn had it been instructed to do so, amount to nothing more than speculation on the part of the defendant. It is not reasonably probable, in light of this record, that the jury would have found that the crimes perpetrated against the victim and Betty Doe were not committed by the same person, nor is it reasonably probable that the jury would have found the victim to be an unreliable witness.[30] The defendant certainly was entitled to point out to the jury any infirmity in the state's case due to the state's failure to produce the belt. He was not, however, entitled to an adverse inference instruction.

The trial judge's refusal to provide the jury with an adverse inference instruction was not improper under the circumstances.

V

The defendant next claims that the trial court improperly denied his motion to dismiss on the grounds that service of the arrest warrant had been unreasonably delayed and that the prosecution had not been initiated within the applicable statute of limitations. We disagree.

The following undisputed facts are relevant to this issue. Prior to trial, the defendant filed a motion to dismiss the charges of sexual assault and robbery on the basis that the state had failed to prosecute him within the statute of limitations as prescribed in General

---

[30] The victim testified that during the assault, she removed her own belt and that it was lost in the tobacco field. Thus, the absence of the defendant's fingerprints on the belt is not exculpatory.

Statutes § 54-193.[31]  At the hearing on the motion to dismiss, the state acknowledged that the September, 1984 warrant for the defendant's arrest for the crimes committed against the victim was missing from the police department's file and that, despite a thorough search, it could not be located.  The only document relating to the issuance of the September, 1984 warrant was an information, signed by an assistant state's attorney, asserting that probable cause existed for the issuance of a warrant for the defendant.[32] The information had been signed by a judge finding probable cause on September 24, 1984.

To corroborate the existence of the September, 1984 warrant, the state offered the testimony of former State Trooper Charles VanDerscoff, who stated that in 1984 he had applied for and secured an arrest warrant for the defendant for the sexual assault of Betty Doe. He testified that he had personally "staked out" the defendant's house in February and March, 1984, but that the

---

[31] General Statutes § 54-193 provides in relevant part: "Limitation of prosecutions for various offenses. (a) There shall be no limitation of time within which a person may be prosecuted for a capital felony, a class A felony or a violation of section 53a-54d.

"(b) No person may be prosecuted for any offense, except a capital felony, a class A felony or a violation of section 53a-54d, for which the punishment is or may be imprisonment in excess of one year, except within five years next after the offense has been committed. . . .

"(c) If the person against whom an indictment, information or complaint for any of said offenses is brought has fled from and resided out of this state during the period so limited, it may be brought against him at any time within such period, during which he resides in this state, after the commission of the offense."

Sexual assault in the first degree is a class B felony, and robbery in the second degree is a class C felony. See footnotes 1 and 3. Hence the statute of limitations for both crimes is five years. The crime of kidnapping in the first degree is a class A felony; see footnote 2; and, therefore, carries no statute of limitation.

[32] The information also bore a Hartford police department case number, the defendant's name and address, the date and place of the alleged crimes, the geographical area court number, and the dated attestation signatures of an assistant state's attorney and a judge.

warrant could not be served until 1990, because the defendant had been a fugitive from 1984, until 1990, when the warrant was served. VanDerscoff also testified that the defendant had been considered a fugitive, and that, according to state police procedures, sources were checked every six months in an attempt to try to locate persons on the fugitive list.

The defendant offered testimony from his common law wife and friends who testified that, during the relevant time period, they had repeatedly seen and spoken with the defendant and that he had lived in Hartford and commuted daily to Long Island to work.

The trial court denied the defendant's motion to dismiss, concluding that the defendant had not sustained his burden of proof. The trial court found that the defendant's witnesses were not credible and that, even though the September, 1984 warrant had been lost, state officials can be presumed to perform their duties and it was proper to infer that the September, 1984 warrant had been issued and that service of the warrant had not been unreasonably delayed.[33]

"The statute of limitations is . . . an affirmative defense. *State* v. *Coleman,* [202 Conn. 86, 90, 519 A.2d

---

[33] The pertinent text of the trial court's ruling was as follows· "The evidence received in this hearing has been the copy of an information which initiated the issuance of a warrant for the defendant's arrest in September of 1984

"The court, by virtue of presumption that officers, public officers acting in their official capacity, unless shown otherwise, have the presumption that they will comply with their duties, so that the court, without other evidence, can presume that [the assistant state's attorney] had the warrant issued for the defendant's arrest in September of 1984.

"The burden of showing that the service of such warrant was unreasonably delayed is upon the one attacking the warrant of arrest under the statute of limitations, which is an affirmative defense that bears the defendant's burden of proving by a fair preponderance of the evidence that there was unreasonable delay.

* * *

"[I]t's obvious that the state police had a warrant for the defendant's arrest and that they followed a procedure to attempt to locate the defendant and

1201 (1987)]; *State* v. *Littlejohn*, 199 Conn. 631, 640, 508 A.2d 1376 (1986). Consequently, the burden [is] on the defendant to prove the elements of the defense by a preponderance of the evidence. *State* v. *Coleman*, [supra, 90]; *State* v. *Littlejohn*, [supra, 640]; see General Statutes § 53a-12 (b); *United States* v. *Karlin*, 785 F.2d 90, 92 (3d Cir. 1986) [cert. denied, 480 U.S. 907, 107 S. Ct. 1351, 94 L. Ed. 2d 522 (1987)]." *State* v. *Crawford*, 202 Conn. 443, 451, 521 A.2d 1034 (1987).

"The issuance of an arrest warrant is sufficient 'prosecution' to satisfy the statute of limitations only if the warrant is executed with due diligence." *State* v. *Ali*, 233 Conn. 403, 416, 660 A.2d 337 (1995); see *State* v. *Crawford*, supra, 202 Conn. 447. " 'A reasonable period of time is a question of fact that will depend on the circumstances of each case. If the facts indicate that an accused consciously eluded the authorities, or for other reasons was difficult to apprehend, these factors will be considered in determining what time is reasonable.' " *State* v. *Ali*, supra, 415, quoting *State* v. *Crawford*, supra, 451. Thus, if the defendant puts forward evidence to suggest that the state reasonably could have executed the warrant sooner, "the issue of whether the state executed the warrant within a reasonable period of time [is] properly a question of fact for the jury." *State* v. *Ali*, supra, 416.

### A

Before addressing whether the trial court was required to grant the motion to dismiss on the basis that the service of the warrant had been unreasonably delayed, we must first resolve that claim's factual predicate, whether an arrest warrant had ever been issued in

could not until sometime in 1991, which bears an analogy to any efforts that might have been produced in this case.

\* \* \*

"So the defendant has not borne the burden of showing that the delay was unreasonable."

connection with the victim's allegations. The defendant argues that there was insufficient evidence to support the trial court's inference that the September, 1984 warrant was issued and that the trial court improperly relied upon the presumption that public officials, acting in their official capacities, fulfill their duties. We believe that this was a preliminary question of fact to be decided by the court and conclude that the court was not clearly erroneous in finding that the warrant had been issued.

"Factual matters are determined by the finder of fact and are not subject to reversal on appeal unless such findings are clearly erroneous. *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 691, 620 A.2d 771 (1993); *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992)." *State* v. *Zarick*, 227 Conn. 207, 228, 630 A.2d 565, cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993). "A finding of fact must stand if it is reasonably supported by the evidence or the reasonable inferences drawn from the facts proven." *Tragakiss* v. *Dowling*, 183 Conn. 72, 73, 438 A.2d 818 (1981). " 'Weighing the evidence and judging the credibility of the witnesses is the function of the trier of fact and this court will not usurp that role. *Munn* v. *Scalera*, 181 Conn. 527, 530–31, 436 A.2d 18 (1980); *Johnson* v. *Flammia*, 169 Conn. 491, 497, 363 A.2d 1048 (1975).' *Gallo* v. *Gallo*, 184 Conn. 36, 38–39, 440 A.2d 782 (1981)." *Temple* v. *Meyer*, 208 Conn. 404, 407, 544 A.2d 629 (1988).

On this preliminary question of fact, the state bore the burden of proving, by a preponderance of the evidence, that the warrant existed and was in fact issued in 1984. The state bore the burden of proof on this preliminary question of fact because it had exclusive control over the documents and witnesses that would have been relevant to show whether a warrant had ever been issued. 52 Am. Jur. 2d, Lost and Destroyed Instruments § 23 (1970); see also *Wheeler* v. *State*, 629 S.W.2d

881, 883 (Tex. App. 1982); *Randolph* v. *Commonwealth*, 145 Va. 883, 886–87, 134 S.E. 544 (1926). There were but a few ways in which the state could prove that the warrant had been issued in September, 1984: (1) produce the warrant itself; (2) produce the persons who issued the warrant; or, (3) produce secondary evidence in support of its issuance. 52 Am. Jur. 2d, supra, § 34.

Here, there is little question that the September, 1984 warrant was lost. It appears from the record that, due to the seven year delay, many of the persons with information regarding the warrant were either dead or unavailable.[34] Therefore, the only evidentiary support was secondary evidence, namely the information and the testimony of a state trooper assigned to another case also involving the defendant.

Relying on this secondary evidence and without evidence to the contrary, the trial court inferred that a prudent assistant state's attorney, acting in his official capacity, would have presented the information to a judge for a probable cause determination and subsequently issued an arrest warrant for the defendant.

We agree with the trial court that there is a presumption that public officials entrusted with specific public functions related to their jobs properly carry out their duties. See, e.g., *Beechwood Gardens Tenants' Assn.* v. *Dept. of Housing*, 214 Conn. 505, 514–15, 572 A.2d 989 (1990); *Bowman* v. *1477 Central Avenue Apartments, Inc.*, 203 Conn. 246, 255, 524 A.2d 610 (1987); *Brookfield* v. *Candlewood Shores Estates, Inc.*, 201 Conn. 1, 6, 513 A.2d 1218 (1986); *Aczas* v. *Stuart Heights, Inc.*, 154

[34] Wertz was not available to testify at trial because she had retired from the police force and moved to Florida. At the time of the trial, she could not be located. In addition, Detectives Ronald Faggaini and Henry Sullivan, who were responsible for the handling of the victim's case in September, 1984, died before trial began. The state did not offer any explanation as to why it did not call any other persons who may have had knowledge regarding the issuance of the warrant.

Conn. 54, 58–59, 221 A.2d 589 (1966); *State* v. *Lenihan*, 151 Conn. 552, 555, 200 A.2d 476 (1964). Indeed, " '[i]t is . . . presumed until the contrary appears that a public officer acting officially has done his duty.' *State* v. *Lenihan*, [supra, 555]." *State* v. *Crawford*, supra, 202 Conn. 451. Given the reality that documentation corroborating official action is sometimes lost in an administrative morass, it is proper to rely on such a presumption where other evidence exists to support the ultimate conclusion. Other jurisdictions, confronted with similar situations, have allowed secondary evidence, such as testimony and documentation other than a warrant itself, to establish the existence of a lost warrant. See, e.g., *People* v. *Wright*, 52 Cal. 3d 367, 391–93, 802 P.2d 221, 276 Cal. Rptr. 731, 802 P.2d 221 (1990); *People* v. *Armstrong*, 232 Cal. App. 3d 228, 245, 283 Cal. Rptr. 429 (1991); see also *Orso* v. *Honolulu*, 56 Haw. 241, 243, 534 P.2d 489 (1975); *Taylor* v. *State*, 19 Md. App. 386, 397, 311 A.2d 468 (1973); 52 Am. Jur. 2d, supra, § 34.

We conclude that the testimony of VanDerscoff and the original information provided the trial court with a sufficient basis upon which to determine that the state had met its burden in showing that an arrest warrant for the defendant had been issued in September, 1984. Thus, we further conclude that this preliminary finding of fact was not clearly erroneous.

B

We next address whether the trial court was required to conclude that the police unreasonably delayed execution of the arrest warrant such that the issuance of the warrant was not "prosecution" within the meaning of § 54-193.

At trial, VanDerscoff testified that he had diligently tried to locate the defendant and that it was the practice of the state police periodically to check to see if persons

listed on the fugitive status list could be located. On the basis of this testimony, the trial court found that the defendant was sufficiently elusive such that the police, despite efforts, could not reasonably locate him between 1984 and 1990. The defendant, however, did not ask that the statute of limitations be presented to the jury as an affirmative defense. Instead, he asked that the charge be dismissed as an issue of law. Although the issue of the diligence by the police in executing the warrant may have been sufficiently presented to create an issue of fact for the jury, in the absence of a request to charge, the trial court was under no duty to charge the jury on the statute of limitations. *State* v. *Harrison*, 34 Conn. App. 473, 492, 642 A.2d 36 (1994); *State* v. *Parsons*, 28 Conn. App. 91, 96–97, 612 A.2d 73, cert. denied, 223 Conn. 920, 614 A.2d 829 (1992).

Accordingly, we conclude that the trial court properly denied the defendant's motion to dismiss.

## VI

The defendant's final claim is that the trial court's gender based references in its preliminary instructions on the concept of reasonable doubt[35] to the venire panels

---

[35] In explaining the concept of reasonable doubt, the trial court instructed all potential jurors, in relevant part, as follows: "You've all heard of like expressions which appear to be similar, such as proof beyond any doubt, proof beyond the possible doubt, or even an expression—given the benefit of the doubt. Those are not the legal standard of proof in a criminal case. The legal standard of proof in a criminal case is proof beyond a reasonable doubt. And I emphasize the word reasonable because the doubt must be drawn from the evidence, or the lack of evidence, by the mental process of reason. So, it does exclude certain things that you use to determine your own conduct in the ordinary course of your lives. You know, most of us bet on the lottery each week. And we may select numbers from our birth date, our address, our license plate, our telephone number. But even if we win, we can't look back and say by the mental process of reason, we knew those numbers were going to come up in that basket. We made a good guess. We were lucky. Had a good hunch. But it wasn't made on basis of reason. And therefore, may not be used to determine reasonable doubt, or facts, or issues in a criminal case.

violated his state and federal constitutional rights to due process of law and to a fair trial. Specifically, the defendant argues that the trial court's example that a woman's intuition was not a reasonable doubt created a fatally impermissible articulation requirement[36] under *State* v. *Jeffrey*, 220 Conn. 698, 719, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992), which remained uncured by the final charge and, thus, requires a new trial. We disagree.

The defendant concedes that this claim was not properly preserved at trial, yet seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 239–40. See footnote 24. A defendant may prevail under the third prong of *Golding* on a claim of instructional error "only if, considering the substance of the charge rather than the form of what was said, it is reasonably possible that the jury was misled." (Internal quotation marks omitted.) *State* v. *Walton*, 227 Conn. 32, 65, 630 A.2d 990 (1993). We conclude that it is not reasonably possible that the jury was misled by this preliminary charge.

"Likewise, you may ask a woman why she's done a certain thing, or why she's done it now, or why she's done it in the manner in which she's done it. If her only answer is—My woman's intuition told me it was the proper thing to do, or the proper time to do it, or the proper way to do it, then it's not based on a mental process of reason. And it may not be used to determine reasonable doubt, or facts, or issues in a criminal case.

"Likewise, there's a slang expression you hear often today—I have a gut feeling that such and such has happened. You may not use gut feelings to determine reasonable doubt, or facts or issues in a criminal case. And there are other biological symptoms that do raise doubts into our minds. One that comes to my mind is the itchy elbow. Any time I have an itchy elbow I think—Well, maybe I shouldn't do what I'm planning, or maybe I shouldn't do it now, or maybe I shouldn't do it in the way I was planning on doing it. But, I can't look at my itchy elbow and say that's based on a mental process of reason. And I shouldn't even allow it to conduct my activities. And I certainly couldn't use it to determine reasonable doubt in a criminal case, or facts, or issues in a criminal case."

[36] An instruction imposes an impermissible articulation requirement when it requires a juror to be able to explain or to articulate a reason for entertaining a reasonable doubt as to the guilt of the defendant. See *State* v. *Jeffrey*, 220

Preliminary instructions to prospective jurors in a criminal case are not mandatory. *State* v. *Lewis*, 220 Conn. 602, 614, 600 A.2d 1330 (1991); see *State* v. *Woolcock*, 201 Conn. 605, 622, 518 A.2d 1377 (1986). "When preliminary instructions are given, they 'do not supersede those given after evidence and arguments under our practice.'" *State* v. *Lewis*, supra, 614, quoting *State* v. *Woolcock*, supra, 623; see also *State* v. *DelVecchio*, 191 Conn. 412, 422, 464 A.2d 813 (1983). "Although [j]udicial attempts to clarify the meaning of the phrase reasonable doubt by explanation, elaboration or illustration . . . more often than not tend to confuse or mislead, such illustrations do not necessarily constitute reversible error. *State* v. *DelVecchio*, [supra, 420–21]. [T]he question on appeal is whether the court's statements correctly conveyed the concept of reasonable doubt to the jury. Id., 421. In determining whether preliminary jury instructions require reversal, we must ask whether the jury was fully and properly instructed at the critical time, after all the evidence and after the arguments of counsel. *State* v. *Lewis*, [supra, 614]." (Internal quotation marks omitted.) *State* v. *Marra*, supra, 222 Conn. 536–37.

Our review of the entire record in this case persuades us that the defendant was not prejudiced by the reference in the trial court's preliminary instructions to a "woman's intuition" as one of several examples of methods that cannot be used in determining reasonable doubt. The jury was fully and correctly instructed as to the principles of the defendant's presumption of innocence and the state's burden of proof beyond a reasonable doubt at final instructions.[37]   Therefore, the

Conn. 698, 719, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992).

[37] The trial court's final instructions did not discuss "woman's intuition" in explaining the concept of reasonable doubt. The defendant does not claim on appeal that the trial court's final instructions were improper, nor did he seek a curative final instruction as to the preliminary instructions.

defendant was not deprived of his constitutional right to a fair trial, and may not prevail under *State* v. *Golding*, supra, 213 Conn. 239–40, because he has not demonstrated that an error of constitutional dimension clearly exists. Similarly, the preliminary instructions did not affect the fairness or integrity of the proceedings and, therefore, did not constitute an impermissible articulation requirement. *State* v. *Jeffrey*, supra, 220 Conn. 710–11.

While we are unpersuaded by the defendant's claim that the trial court's instructions imposed a fatal articulation requirement that denied him his constitutional right to a fair trial, we do accept the defendant's entreaty that we strongly reaffirm our rejection of all gender biased language from any jury instructions, and we now unequivocally do so. We reemphasize the cogent and succinct statement of the Appellate Court that "[g]ender bias, particularly bias based on stereotypes, has no place in the courtroom. The court should not have placed its judicial imprimatur on a platitude that neither defines a legal concept nor enhances a bias-free atmosphere." *State* v. *Walker*, 33 Conn. App. 763, 770–71, 638 A.2d 1084, cert. denied, 229 Conn. 913, 642 A.2d 1209 (1994); see also *State* v. *Williams*, 231 Conn. 235, 246–47, 645 A.2d 999 (1994).

The judgment is affirmed.

In this opinion the other justices concurred.