STATE OF CONNECTICUT *v.* ROBERT CAMERA
(AC 23117)

Bishop, DiPentima and Mihalakos, Js.

Argued October 29, 2003—officially released January 20, 2004

*Theresa Soto* and *Linda Currie*, certified legal interns, with whom were *Lauren Weisfeld*, assistant public defender, and, on the brief, *G. Douglas Nash*, public defender, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Mary Elizabeth Baran*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Robert Camera, appeals from the judgment of conviction, rendered after a jury trial, of reckless assault in the first degree in violation of General Statutes § 53-59 (a) (3).[1] On appeal, the defendant claims that (1) the trial court failed to conduct an adequate hearing into potential jury bias and jury taint, (2) the court abused its discretion in admitting evidence of prior uncharged misconduct by the defendant and (3) he is entitled to a new trial because of prosecutorial misconduct. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of September 9, 1997, the victim

---

[1] The defendant originally was charged in a two count information with intentional assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and reckless assault in the first degree in violation of § 53a-59 (a) (3). He was acquitted of intentional assault in the first degree.

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

and the defendant were at Dudley's, a Wallingford bar. The two men were seated across the bar from each other after playing in a setback tournament.[2] They were acquainted as former workers at Dudley's and teammates on a softball team. The defendant remarked to Dicky Hominski, the owner of Dudley's, "Since when do you let a__holes back into the bar?" Thereafter, the defendant said to the victim, "You have thirty seconds to drink your drink and get the f__ out of the bar." Approximately thirty seconds later, the victim felt a tap on his shoulder and was struck in the head by a bottle as he turned around.

The victim testified that he did not observe the defendant striking him, but that the defendant was standing behind him immediately after the attack. The state also produced witnesses who testified as to the defendant's proximity to the victim after the attack. Richard Dombroski testified that he heard the victim and the defendant "having words" across the bar and then observed the defendant walking across the bar with a bottle in his hand. He then heard a "pop" and turned to see the defendant standing next to the victim holding a broken beer bottle.

Richard Remnick, who treated the victim at the Mid-State Medical Center in Meriden, testified that the victim's injuries were consistent with a hard downward strike with a beer bottle. Ronald Gross, the physician who treated the victim at Hartford Hospital, also testified that the victim's injuries were consistent with a strike on the head with a beer bottle.

Kevin Collins, another Dudley's patron, testified that while he was attempting to stop the victim's bleeding outside of the bar, the defendant rode up on his motorcycle and threatened the victim not to press charges. When Dombroski asked the victim who had attacked

[2] "Setback" is a card game.

him, the victim responded "Bobbo." When Dombroski asked the victim who "Bobbo" was, he said the defendant's name. The victim at trial also identified the defendant as his assailant. The defendant himself, upon encountering the victim at a snack bar during a break from trial, said to the victim, "We all make mistakes that we regret."

After the jury trial, the defendant was convicted of reckless assault in the first degree. The court sentenced the defendant to eight years incarceration, execution suspended, with five years probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court failed to conduct an adequate hearing into jury bias and taint, thereby depriving him of his constitutional right to a trial by an impartial jury. Specifically, he contends that the court did not sufficiently inquire into possible bias and potential jury taint resulting from that bias in accordance with the court's duty to safeguard the defendant's right to an impartial jury. We disagree.

The following additional facts are necessary for our resolution of that issue. Individual voir dire of V[3] took place on January 18, 2002. On January 28, 2002, the court put on the record a conversation between V and the clerk of the court as recounted by the clerk. According to the clerk, on the same day that V underwent voir dire, V inquired of the clerk whether his name would be used in court. When the clerk asked him the reason for his question, V responded that he was concerned about the defendant's knowing his name because V had family in the area with the same name. The clerk inquired as to whether it was going to be a

---

[3] We use initials for the venirepersons to protect their legitimate privacy interests. See *State* v. *Jackson*, 73 Conn. App. 338, 344 n.6, 808 A.2d 388, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002).

problem that his name would be called when taking the roll, to which V responded that it would not be a problem and "to just forget it."

At that point, counsel for the defendant requested an inquiry to determine whether V could be fair and impartial. The court summoned V to the courtroom and conducted an inquiry into whether he could serve as an impartial juror.[4] V responded that he could remain a fair and impartial juror. Defense counsel expressed worry about whether V had spoken to the remaining jurors about his concerns, but did not request that the court take any further action. Defense counsel later returned to the issue, asking the court to inquire of V whether he had expressed his concerns to the remaining jurors. The court declined to make such an inquiry.

The law relating to alleged juror misconduct is well settled. *State* v. *Feliciano*, 256 Conn. 429, 447, 778 A.2d 812 (2001). "Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . [T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the

---

[4] The following is the conversation that took place between the court and V:

"The Court: All right. Do you feel that you could be a fair juror in this case?

"The Juror: Yes, sir.

"The Court: All right. Did you have any concerns about your name being used and spoken?

"The Juror: It was just a funny thing, I couldn't remember if they did use my name or not, you know, during the questioning. I was just questioning that aspect of it.

"The Court: Okay. All right. And that would have—the use of your name is necessary, of course, and the fact that your name has been used, would that affect in any way your concerns about being fair and impartial?

"The Juror: No, sir.

"The Court: All right."

basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court." (Internal quotation marks omitted.) Id., 447–48.

A court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality. *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995) (en banc). "Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jury [bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them. . . . Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . Ultimately, however, [t]o succeed on a claim of [juror] bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 296–97, 750 A.2d 1059 (2000).

"Finally, when, as in this case, the trial court is in no way responsible for the alleged juror misconduct, the defendant bears the burden of proving that the misconduct actually occurred and resulted in actual

prejudice." (Internal quotation marks omitted.) *State* v. *Bangulescu,* 80 Conn. App. 26, 50, 832 A.2d 1187 (2003).

The defendant claims that the court failed to protect his right to an impartial jury by not fully developing the facts. He further contends that the court abused its discretion in that the scope of the inquiry was so limited as to deprive him of his due process right to a fair trial by an impartial jury. In particular, the defendant asserts that the court should have inquired as to any communication V may have had with his fellow jurors regarding his concerns about his name being read aloud in court.

Applying the principles previously set forth, we conclude that the defendant has failed to demonstrate that the inquiry conducted by the court was inadequate to safeguard his right to a trial before an impartial jury. The court expressly addressed the defendant's concern about V's impartiality in its questioning of V. Defense counsel specifically requested that the court inquire into V's ability to be a fair and impartial juror, a request that the court fulfilled. It was not until later that defense counsel definitively asked that the court conduct further inquiry into whether V had expressed his concerns to the remaining jurors. The decision to extend the inquiry was firmly within the court's discretion, and it cannot be said that the court's decision not to extend the inquiry was an abuse of that discretion. *State* v. *Mukhtaar,* supra, 253 Conn. 296–97.

On the basis of our review of the record and applicable law, we conclude that the court did not abuse its discretion in declining to extend the scope of its inquiry into possible jury bias.

II

The defendant's second claim is that the court abused its discretion by admitting evidence of his uncharged conduct because it was neither relevant nor material.

In the alternative, he contends that the court abused its discretion because the probative value of the evidence did not outweigh its prejudicial effect. We disagree.

The following additional facts are necessary for our resolution of that issue. The state wanted to present evidence of two prior encounters between the defendant and the victim. After a hearing, the court ruled that the state could introduce the uncharged misconduct because it was relevant to the issues of identity, intent, motive and malice, and because the probative value of the evidence outweighed any possible prejudice.

The state presented that evidence during the direct examination of the victim and Thomas Doucet. The victim testified that the defendant had offered to sell him fake insurance cards for $20 each one year prior to the assault at issue in this appeal. The victim, on viewing the cards, decided against the purchase and left $20 at Dudley's with a note thanking the defendant for his efforts. The defendant then came to the Pavilion, the victim's workplace, demanding more money from the victim for the cards. When the victim refused, the defendant punched him in the mouth. One week or so later, while the victim was drinking beer with a man named "Billy," the latter remarked, "Oh, that's all [the defendant] did to you?" The defendant returned to the Pavilion and punched the victim again, remarking, "Is that good enough now?"

Doucet was present when the defendant came to the Pavilion. He observed the defendant pushing the victim in a hostile manner toward the kitchen. He heard the two struggling in the kitchen. When he entered the kitchen, he observed the victim with a cut lip and his back against the wall. The defendant was facing the victim and was not injured.

"We begin our review of the trial court's action by noting that [a]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . Evidence of prior misconduct may be admitted, however, when the evidence is offered for a purpose other than to prove the defendant's bad character or criminal tendencies. . . . Exceptions to the general rule precluding the use of prior misconduct evidence have been recognized in cases in which the evidence is offered to prove, among other things, intent, identity, motive, malice or a common plan or scheme. . . .

"In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 659–61, 835 A.2d 895 (2003); see also Conn. Code Evid. § 4-5.[5]

---

[5] Connecticut Code of Evidence § 4-5 provides in relevant part: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. . . ."

Under the first prong of our analysis, we conclude that the court did not abuse its discretion in admitting the uncharged misconduct evidence because the evidence was relevant and material. "The first prong of the test requires the trial court to determine if an exception applies to the evidence sought to be admitted." (Internal quotation marks omitted.) *State* v. *Merriam*, supra, 264 Conn. 661. In this case, the two prior encounters between the defendant and the victim were highly probative of intent, motive and identity.

As argued by the state, the evidence demonstrated a history between the two men over money for fake insurance cards, revealing the potential hostility that the defendant may have harbored toward the victim and, therefore, a motive to attack him on September 9, 1997. In addition, both incidents involved the same individuals involved in the present matter. Further, the defendant had attacked the victim on both occasions. The evidence also was probative of identity because there were no eyewitnesses to the September 9, 1997 assault.

The defendant specifically argues that the uncharged misconduct evidence was inadmissible for purposes of proving identity because the incidents did not rise to the level of a signature offense. He relies on *State* v. *Figueroa*, 235 Conn. 145, 665 A.2d 63 (1995), in making that contention. His reliance on *Figueroa*, however, is misplaced.

"The first threshold for the use of evidence of other crimes or misconduct on the issue of identity is that the methods used be sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. . . . [Charles T. McCormick, the author of an evidence treatise] points out that in proffering other crime evidence [t]o prove other like crimes by the accused so nearly identical in

method as to earmark them as the handiwork of the accused . . . much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature. . . . In order to determine if this threshold criterion for admissibility has been met, we must examine the proffered evidence and compare it to the charged offenses." (Citations omitted; internal quotation marks omitted.) Id., 163.

A comparison of the crime charged with the incidents of uncharged misconduct reveal various similarities that make the evidence proper for the purpose of proving identity. On all three occasions, the defendant was the aggressor and assailant. His behavior also was directed at the victim in all three encounters. In addition, the three incidents occurred within one year of each other.

In accordance with the second prong of our analysis, we conclude that the probative value of the evidence outweighed its prejudicial effect. As stated, "[b]ecause of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *George B.*, 258 Conn. 779, 791, 785 A.2d 573 (2001).

The court held a hearing on the admissibility of the uncharged misconduct evidence. The court expressly concluded that the evidence was probative of identity, intent, motive and malice. The court further determined that even though the evidence may be prejudicial, the probative value outweighed any prejudicial effect. The court also gave a limiting instruction at the conclusion

of that evidence.[6] "Because the trial court weighed the probative value of the evidence against its prejudicial effect and gave the jury specific limiting instructions regarding the proper purpose of the evidence, it is reasonable to infer that . . . the probative value of the evidence outweighed any prejudicial effect the evidence might have." *State* v. *Figueroa*, supra, 235 Conn. 166–67.

On the basis of our analysis, we conclude that the court did not abuse its discretion in admitting evidence of uncharged misconduct perpetrated by the defendant. The evidence satisfies both prongs of the applicable analysis in that it was both relevant and material, and its probative value outweighed its prejudicial effect.

## III

The defendant's last claim is that prosecutorial misconduct during his trial requires that he be granted a new trial. Specifically, he argues that the prosecutor improperly used both cross-examination and summation to shift the burden of proof to the defendant and to mislead the jury into believing that the defendant had a duty to assert his innocence, thereby violating his due process right to a fair trial. He argues that the prosecutor, during cross-examination, alluded to a duty on the defendant's part to initiate contact with the police and that failure to do so was evidence of culpability. The defendant contends that the prosecutor returned to that theme during summation, which the

---

[6] The court instructed the jury as follows: "[L]adies and gentlemen, with respect to testimony that you have heard with respect to two incidents of punching claimed to have been done by the defendant against [the victim] and [Doucet's] testimony as to what he observed at the Pavilion, this testimony is not offered to prove the good character or bad character of the defendant and not to show that he's either a good person or a bad person. This evidence is limited only to the issues in this case of intent and identity and motive and malice relating to the incident on September 9, 1997. And to the extent you find . . . the incident did occur, you may give it such weight as you think is relevant on those issues and elements."

defendant maintains was sufficient in and of itself to have deprived him of a fair trial. We disagree.

The following additional facts are necessary for our resolution of that final issue. The prosecutor, on cross-examination, probed into the defendant's departure from Dudley's after the assault. The prosecutor questioned him on why he left Dudley's instead of explaining to the police that the incident was an accident, as the defendant claimed during trial. The defendant admitted that he left Dudley's after the incident, but before the police arrived, to go to another bar while the victim was bleeding on the pavement outside of Dudley's. He further testified on redirect examination that he spoke with the police on September 11, 1997, after being contacted by Officer Glenn Odelle of the Wallingford police department.

In her closing argument, the prosecutor revisited the defendant's avoidance of the police, pointing out to the jury that the defendant left the scene of the assault rather than speak with the police or explain that the incident was an accident. The prosecutor also mentioned that the defendant did not speak with the police until they contacted him, whereupon he explained that the incident was an accident.

The defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823[7] (1989), because

[7] Our Supreme Court in *Golding* held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

he did not object to the prosecutor's remarks on the grounds now alleged.[8] We decline to review the claim because we conclude that it fails the second prong of *Golding*.

The state argues that the defendant's claims are evidentiary rather than constitutional in nature. It further contends that the prosecutor, in presenting evidence of the defendant's flight from the scene of the assault, was developing an inference of consciousness of guilt. The state claims that referencing the defendant's avoidance of the police on the night in question was proper in advancing such a theory.

"It has . . . been stated numerous times that consciousness of guilt issues are not constitutional and, therefore, are not subject to review under the [standard of *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973), as modified by *Golding*]. . . . It is well settled that the trial court can be expected to rule only on those matters that are put before it. . . . With only a few exceptions . . . we will not decide an appeal on an issue that was not raised before the trial court. . . . To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *State* v. *Lacks*, 58 Conn. App. 412, 424, 755 A.2d 254, cert. denied, 254 Conn. 919, 759 A.2d 1026 (2000).

We agree with the state's characterization of the defendant's claim as evidentiary rather than constitutional under the specific facts of this case. The references made by the prosecutor to the defendant's departure from the scene before the police arrived and subsequent unwillingness to contact the police pertained to consciousness of guilt. Accordingly, the defen-

---

[8] Defense counsel objected on the grounds of repetitive and inflammatory questioning. Defense counsel did not object during the prosecutor's closing argument.

dant's claim is actually premised on the propriety of the prosecutor's questioning on the subject of consciousness of guilt, rather than on alleged prosecutorial misconduct. In the context of this case, therefore, the defendant's claim must be considered evidentiary rather than constitutional in nature.

The judgment is affirmed.

In this opinion the other judges concurred.