# STATE OF CONNECTICUT *v.* ANGEL ROBLES
## (AC 27010)

DiPentima, McLachlan and McDonald, Js.

Argued March 13—officially released August 28, 2007

*Joseph A. Jaumann*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Howard S. Stein*, assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Angel Robles, appeals from the judgment of conviction, rendered following a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), and risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (2).[1] On appeal, the defendant

---

[1] The defendant received a total effective sentence of twenty-five years imprisonment, execution suspended after fifteen years, with fifteen years probation.

claims that (1) the state engaged in a pattern of prosecutorial impropriety,[2] which denied the defendant the right to a fair trial or constituted plain error, (2) the court improperly permitted the state to introduce evidence of the defendant's prior misconduct and (3) the court improperly permitted the state to present testimony from an expert, who had interviewed the victim, regarding general characteristics of child sexual abuse. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim[3] had known the defendant since she was approximately five to seven years old. When she first came into contact with the defendant, the victim and her immediate family lived in Poughkeepsie, New York, where the defendant, who was the boyfriend of the victim's aunt, also lived. At that time, the defendant would occasionally watch the victim and her siblings while the victim's mother and her aunt went out. The victim testified that on many of these occasions, while the victim and the defendant were in her mother's room, the defendant initiated sexual contact with her by rubbing her chest and vagina underneath her clothing and attempted unsuccessfully to engage in sexual intercourse with her. The victim's mother testified that the defendant was in his early twenties at the time.

When the victim was approximately eight years old, she and her family moved to an apartment in Bridgeport.

[2] Subsequent to oral argument in this court, our Supreme Court rendered its decision in *State* v. *Fauci*, 282 Conn. 23, 917 A.2d 978 (2007), in which it determined that the term "prosecutorial impropriety" is more appropriate than the traditional term "prosecutorial misconduct." Id., 26 n.2. Although the parties briefed and argued the defendant's claim under the more traditional nomenclature, we have adopted the term prosecutorial impropriety in our analysis of the defendant's relevant claims.

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Shortly after the victim moved to Bridgeport, the victim's aunt and the defendant moved there as well, taking up residence in an apartment upstairs from the victim and her family. The victim testified that, during the period when she was between the ages of eight to approximately eleven or twelve years old, the defendant continued to engage in the same type of sexual contact with her. She testified specifically to an incident that occurred in her aunt's upstairs apartment when the defendant began groping and touching her chest area, removed her shorts and attempted to have sexual intercourse with her. She testified that she was successful in warding off his attempts at that time.

Both the victim and the defendant changed residences on at least two subsequent occasions; however, they stayed in Bridgeport and always remained in relative proximity to each other. When the victim was approximately twelve years old, she began to baby-sit for her younger cousin at the home of her aunt and the defendant. The victim testified that one night, when she was twelve years old, the defendant came into her cousin's room where she was sleeping and had sexual intercourse with her. She testified that this occurred on other occasions, at times when she would sleep overnight at her aunt's house. She gave a detailed account of another incident that occurred in her cousin's room when the defendant attempted unsuccessfully to engage in anal intercourse with her. After this incident, the victim confronted the defendant and warned him that she would tell her mother what was occurring if it continued. According to the victim, the sexual assaults stopped after this confrontation.

The victim first reported the sexual assaults to her former boyfriend's mother, J, years later, in 2001. J advised the victim not to tell her boyfriend, S, because J feared that her son would get hurt or do something irrational after hearing that the abuse had occurred.

Eventually, the victim told S about the assaults approximately two years after she made the initial disclosure to J.

In July, 2003, the victim and S were in an argument on the street outside of the victim's home, which eventually required police intervention. Many other people were present, including the victim's mother, her aunt, the defendant and J. At some point during the argument, the victim's aunt got involved. In response to a comment made to S by the victim's aunt, S stated, "you shouldn't be worried about me, you should be worried about [the defendant]. He molested her when she was little."

After this argument, the victim admitted to her mother that she had been sexually assaulted by the defendant. The assaults eventually were reported to the authorities in July, 2003. Additional facts will be set forth as necessary.

I

The defendant's first claims involve allegations of prosecutorial impropriety. The defendant concedes that his prosecutorial impropriety claims were not preserved at trial. In reviewing unpreserved claims of prosecutorial impropriety, we engage in a two step analytical process, making an initial determination as to whether prosecutorial impropriety occurred and, if so, examining whether it deprived the defendant of his due process right to a fair trial by applying the factors set forth in State v. Williams, 204 Conn. 523, 540, 529 A.2d 653 (1987). See State v. Fauci, 282 Conn. 23, 32–33, 917 A.2d 978 (2007). "[W]e emphasize that counsel's failure to object at trial, while not by itself *fatal* to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . . Put differently . . . prosecutorial [impropriety] claims [are] not

intended to provide an avenue for the tactical sand-bagging of our trial courts, but rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Emphasis in original; internal quotation marks omitted.) *State* v. *Boyd*, 89 Conn. App. 1, 27–28, 872 A.2d 477, cert. denied, 275 Conn. 921, 883 A.2d 1247 (2005).

## A

The defendant first claims that throughout the trial, the prosecutor improperly alluded to unsupported allegations that the defendant fled the state after the accusations against him surfaced. Specifically, the defendant claims that the prosecutor posited questions to four witnesses,[4] probing whether the defendant had gone to his mother's house in Poughkeepsie, New York, after the allegations against him had been lodged, without any evidence that the defendant had left the jurisdiction. He argues that the state's use of these unsupported allegations to imply flight and consciousness of guilt on his part amounted to prosecutorial impropriety that deprived him of a fair trial or, in the alternative, constituted plain error warranting reversal.

With respect to the defendant's claim of prosecutorial impropriety, the state argues that the defendant's claim pertains to consciousness of guilt testimony, and, therefore, the claim is evidentiary in nature, without constitutional ramifications. Because this evidentiary claim was not preserved at trial, the state argues that we should decline to review the issue. We agree.

At trial, after the state presented its case-in-chief, the defense called two witnesses, the defendant and his

---

[4] As reflected in the record, the state questioned only three witnesses, the victim's aunt, her uncle and the defendant, specifically about whether the defendant had left the state and gone to Poughkeepsie after the July, 2003 incident. The fourth witness, the victim's mother, was not questioned about whether the defendant had left the state and merely indicated that the defendant remained in Connecticut after the incident.

girlfriend, the victim's aunt. It was during this testimony that the state first sought to question the witnesses about the defendant's alleged flight to Poughkeepsie, an event that they denied had occurred. After the defense rested, the state called one rebuttal witness, the victim's uncle, and questioned him about whether the defendant had gone to New York after the July, 2003 incident. Although the victim's uncle denied that the defendant told him that he had gone to New York, he stated that he assumed that the defendant had gone to Poughkeepsie and admitted that he may have told an investigator that during a telephone conversation, the defendant told him that he had gone to Poughkeepsie.

As an initial matter, we must resolve whether the actions of the prosecutor set forth in the defendant's unpreserved claim constitute prosecutorial impropriety. With regard to whether the prosecutor's attempts to put a consciousness of guilt issue improperly before the jury constitutes prosecutorial impropriety, "[i]t has . . . been stated numerous times that consciousness of guilt issues are not constitutional . . . ." (Internal quotation marks omitted.) *State* v. *Rowe*, 279 Conn. 139, 153, 900 A.2d 1276 (2006). As such, they do not necessarily rise to a colorable claim of prosecutorial impropriety. Id., 154.

In *State* v. *Camera*, 81 Conn. App. 175, 839 A.2d 613, cert. denied, 268 Conn. 910, 845 A.2d 412 (2004), the defendant argued that the prosecutor "improperly used both cross-examination and summation to shift the burden of proof to the defendant and to mislead the jury into believing that the defendant had a duty to assert his innocence, thereby violating his due process right to a fair trial. He argue[d] that the prosecutor, during cross-examination, alluded to a duty on the defendant's part to initiate contact with the police and that failure to do so was evidence of culpability. The defendant contend[ed] that the prosecutor returned to that theme

during summation, which the defendant maintain[ed] was sufficient in and of itself to have deprived him of a fair trial." Id., 186–87. The defendant sought review under State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because he had not objected to the prosecutor's remarks as prosecutorial impropriety before the trial court. State v. Camera, supra, 187–88.

In Camera, we declined to review the defendant's unpreserved claim that the prosecutor's use of consciousness of guilt testimony constituted prosecutorial impropriety, concluding that "[t]he references made by the prosecutor to the defendant's departure from the scene before the police arrived and subsequent unwillingness to contact the police pertained to consciousness of guilt. Accordingly, the defendant's claim [that the defendant had a duty to contact the police and that the failure to do so was evidence of culpability] is actually premised on the propriety of the prosecutor's questioning on the subject of consciousness of guilt, rather than on alleged prosecutorial [impropriety]. In the context of this case, therefore, the defendant's claim must be considered evidentiary rather than constitutional in nature." Id., 188–89.

Similarly, in State v. Rowe, supra, 279 Conn. 145, the state presented evidence that the defendant, who was charged with, inter alia, robbery in the first degree, ran from the police on a subsequent occasion during which he was observed discarding contraband. The defendant chose not to present evidence that he fled because of the contraband. At trial, the prosecutor repeatedly argued that the reason the defendant ran from the police was because the car he was using on the night in question was the same car he used during the robbery two weeks earlier. Id., 148–49. Although this court initially reversed the defendant's conviction on the ground of prosecutorial impropriety, our Supreme Court reversed

the decision, noting that the testimony at issue pertained to allegations of the defendant's consciousness of guilt and that the defendant had failed to object to the testimony on that ground. Agreeing with our decision in *Camera,* the Supreme Court concluded that, having failed to object at trial, the defendant had no colorable claim of prosecutorial impropriety with regard to the prosecutor's comments about consciousness of guilt and that the defendant's claim was an unreviewable evidentiary claim. Id., 152.

Here, the defendant's claim is premised only on the propriety of the prosecutor's questioning of the witnesses on the subject of consciousness of guilt. The defendant has referred to nothing in the record to indicate that the state used the purported inference of flight in closing argument,[5] and no consciousness of guilt instruction was requested. Essentially, the defendant argues that it was improper for the prosecutor to have questioned the witnesses about the defendant's flight from the state because the trial witnesses denied that the event occurred,[6]

[5] The defendant does argue that during closing argument, the state improperly referred to the victim's uncle as a defense witness. At trial, after the victim's uncle denied that the defendant had told him that he had gone to Poughkeepsie, the state properly impeached the victim's uncle on his bias toward the defendant and his prior inconsistent statement to the state's investigator. See *State* v. *Winot,* 95 Conn. App. 332, 356, 897 A.2d 115 ("A party may impeach his own witness in the same manner as an opposing party's witness . . . . This right includes impeachment by use of prior inconsistent statements." [Citation omitted; internal quotation marks omitted.]), cert. granted on other grounds, 279 Conn. 905, 901 A.2d 1229 (2006). In this context, the state's isolated remark in closing, which clearly sought to cast the victim's uncle as sympathetic to the defendant on the basis of his trial testimony, was insufficient to deny the defendant a fair trial.

[6] To the extent that the defendant seeks to imply bad faith on the part of the prosecutor in putting forth the questions, such argument is unsupported. Without trial objection, the prosecutor was denied the opportunity to present to the court the basis for questioning the witnesses. Moreover, it is clear from the record that the state did have a good faith basis to question the witnesses, as the victim's uncle testified that he may have told a state's investigator that the defendant informed him that he had fled to Poughkeepsie.

and, therefore, there was no evidence that it occurred.[7]

Thus, we agree with the state's characterization of the defendant's claim as an unpreserved evidentiary claim. When the prosecutor sought to elicit testimony from the witnesses about the defendant's flight to Poughkeepsie, the defendant did not object. Accordingly, we conclude that the defendant has no colorable claim of prosecutorial impropriety with regard to the prosecutor's questions and that the defendant's claim is an unreviewable evidentiary claim. See id.

Alternatively, the defendant argues that we should reverse his conviction under the plain error doctrine. "The plain error doctrine is . . . a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 239–40, 881 A.2d 160 (2005). We conclude that the defendant has suffered no manifest injustice constituting plain error.[8]

---

[7] In response to the state's argument that the claim is merely evidentiary in nature, the defendant argues that both *Camera* and *Rowe* involved incidents in which there actually was evidence of flight, whereas in this matter, the state questioned witnesses about a flight that never took place. In the context of this case, we conclude that such a distinction is without a difference.

[8] The state, relying on information that one witness had given to an investigator, sought to question the defense witnesses about the defendant's having left the state. Thus, the relevance in putting forth its questions to the witnesses may have included the defendant's consciousness of guilt, but also may have served to impeach their credibility to the extent that they denied that the event had occurred, and the state had a prior statement from a

## B

The defendant next claims that the prosecutor improperly asked the jury during closing argument to consider the testimony of the victim's former boyfriend, S, to corroborate the victim's testimony with regard to prior uncharged misconduct evidence, which he argues denied him a fair trial. The defendant claims that the uncharged misconduct evidence brought in through S, which was first elicited by defense counsel, should not have been permitted as constancy of accusation testimony. As such, the defendant claims that the state's comments on the testimony as "corroboration of consistency" during closing argument[9] constituted prosecutorial impropriety, which denied him a fair trial.

During trial, the state indicated that it intended to call S to testify regarding the circumstances surrounding his July, 2003 argument with the victim but also intended to question S as a constancy of accusation witness with respect to the disclosures that the victim had made to him previously that the defendant had abused her sexually. After a lengthy discourse with the court about the admissibility of the evidence under the constancy of accusation exception to the rule against hearsay, the state abandoned its request for permission to question S regarding the disclosure and agreed to limit the testi-

witness supporting the contrary. Further, once these witnesses denied that the event had occurred, the state may have been able to call the victim's uncle as an impeachment witness. These evidentiary questions were never raised at trial, however, because no objection was made.

[9] In closing argument, the prosecutor remarked: "The second reason why [the victim is telling the truth] is [that] her testimony was corroborated by other witnesses. Dates, locations, those things that she told you about, they were corroborated by many people. . . . She said Vaseline [was used by the defendant during the assault] in New York, no Vaseline afterward. [S] came in and said, 'she said Vaseline in New York and no Vaseline afterward.' Little bits of corroboration of consistency from—from time to time in terms of what she told you."

mony to the July, 2003 incident, which it did on direct examination.[10] On cross-examination, however, defense counsel inquired about the disclosure.[11] On redirect, the state then elicited further information about the details of the disclosure in which S testified that the victim had explained to him that the defendant had used Vaseline during the sexual assaults. The state referred to S's redirect testimony in its closing argument. See footnote 9. The defendant did not object either to the testimony elicited by the state on redirect examination of S or to the prosecutor's comments during closing argument.

In asserting his claim on appeal, the defendant concedes that by questioning S about the disclosure on cross-examination, defense counsel opened the door to this testimony. Moreover, the defendant does not object to the testimony itself; rather, his claim is grounded in the assertion that it was improper for the state to comment on the testimony during closing argument because the evidence was inadmissible as constancy testimony.[12] We conclude that the defendant opened

[10] Despite the defendant's assertion that the court "prohibited" the state from eliciting such testimony and that by questioning the witness on this topic, the state may have "circumvented the court order," the record reflects that the state merely abandoned the claim without an express ruling from the court.

[11] During cross-examination of S the following was elicited:

"[Defense Counsel]: Was there a point in your relationship with [the victim] that she told you something about her and [the defendant]?

"[The Witness]: About a year and a half—about a year and half when we started dating, after, she told me.

"[Defense Counsel]: And was this something that happened when she was a little kid in New York?

"[The Witness]: Well, from what I was told, it—it happened in New York, but she never went further. She never told me anything else."

[12] The defendant argues that the admission of the evidence was improper because the admission of constancy of accusation testimony is limited to allegations related to the charged offenses, and allegations of prior uncharged misconduct do not fall within the ambit of the rule. See Conn. Code Evid. § 6-11 (c); State v. Ouellette, 190 Conn. 84, 100, 459 A.2d 1005 (1983) ("the [constancy of accusation] exception applies only to testimony of witnesses to whom the victim complains *concerning the act charged*" [emphasis added]).

the door to the redirect questioning and that the prosecutor's comments on the evidence in closing were not improper.

"Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have 'opened the door' to rebuttal by the opposing party. *Even though the rebuttal evidence would ordinarily be inadmissible on other grounds*, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule 'operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context.' " (Citations omitted; emphasis added.) *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986).

Thus, notwithstanding that such evidence may be otherwise inadmissible, if a party opens the door, the court may, in its discretion, permit a party on rebuttal to offer evidence on the same subject if it is responsive to the previously admitted evidence. The purpose is to prevent one party from making unfair use of certain evidence to that party's advantage, thereby creating a misleading impression to the fact finder.[13] See id. In

[13] As the New Hampshire Supreme Court has explained, " '[o]pening the door' is . . . broadly applied to situations in which one party has created a misleading advantage, and the opponent is then permitted to use previously suppressed or otherwise inadmissible evidence to directly counter the misleading advantage. . . . The rule thus prevents a party from successfully excluding evidence favorable to his opponent and then selectively introducing this evidence for his own advantage, without allowing the opponent to place the evidence in proper context." (Citations omitted.) *State* v. *Morrill*, 154 N.H. 547, 549–50, 914 A.2d 1206 (2006); see also *State* v. *White*, 155 N.H. 119, 124, 920 A.2d 1216 (2007) ("[T]he 'opening the door' doctrine subsumes within it two doctrines governing the admissibility of evidence. . . . The first doctrine, 'curative admissibility,' applies when inadmissible prejudicial evidence has been erroneously admitted, and the opponent seeks to intro-

allowing such evidence, the court must apply a balancing test to determine whether the introduction of the evidence would be unduly prejudicial. See, e.g., *State v. Busque*, 31 Conn. App. 120, 128 n.5, 623 A.2d 532 (1993) ("[b]ecause, as we have stated, [the witness'] testimony was more prejudicial than probative, even if its introduction were permitted under our rules of evidence, we decline to analyze this claim in terms of the doctrine of 'opening the door' "), appeal dismissed, 229 Conn. 839, 643 A.2d 1281 (1994).

Here, the defendant successfully prevented the state on direct examination from introducing testimony from S about the victim's disclosure that the defendant had sexually assaulted her. On cross-examination, the defendant then sought, however, to introduce selected portions of the excluded evidence for his own advantage. Specifically, the record reveals that the defendant sought to attack the victim's credibility by highlighting the fact that she made vague disclosures to S about the sexual assaults and that her disclosures were limited to incidents that occurred outside of the time frame of the charged offenses, thereby creating a misleading impression.[14] Moreover, in closing argument, defense

duce testimony to counter the prejudice. . . . The second doctrine, 'specific contradiction,' is more broadly applied to situations in which one party has introduced admissible evidence that creates a misleading advantage and the opponent is then permitted to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage." [Citations omitted.]).

[14] For example, defense counsel concluded his cross-examination of S as follows:

"[Defense Counsel]: So, in May, 2002, she told you that something happened that [the defendant] did to her when she was a little girl in New York; is that correct?

"[The Witness]: Um-hmm (affirmative), yes, she did.

"[Defense Counsel]: And she was about seven years old?

"[The Witness]: That's what she said.

"[Defense Counsel]: *And that's all you knew; is that correct?*

"[The Witness]: That's all I knew.

"[Defense Counsel]: *She never told you anything else?*

"[The Witness]: No." (Emphasis added.)

counsel also sought to capitalize on the vagueness of the victim's disclosures to S.[15] Thus, the state's follow-up redirect examination, which sought to elicit more details about the nature of the disclosures and to provide a motive as to why the victim may not have been forthcoming to S, was a proper way to place the statements in context and clear up the misleading impression put forth by the defense. Accordingly, we conclude that it was not improper for the state to place the statements in context and to comment on such statements in closing, and, therefore, the defendant has presented no colorable claim of prosecutorial impropriety on this ground.[16]

## II

The defendant next claims that the court improperly permitted the state to introduce evidence of the defendant's misconduct toward the victim that occurred prior to the time period set forth in the information and outside of the state. Specifically, the defendant claims that it was improper to admit the victim's testimony that the defendant initiated sexual contact with her by rubbing her chest and vagina underneath her clothing

---

[15] Prior to the alleged improper remarks by the prosecutor, defense counsel stated in closing that "at some point in May of 2002, according to [S], she told him about Poughkeepsie, or the way she put it, when I was little in New York. She didn't tell him anything else, and apparently she told the same thing to his mother. Because when asked, he said she knew what he knew. And he didn't know anything about [a prior residence] or any of those other places in Bridgeport."

[16] Even if we assume arguendo that the remark constituted an impropriety, we fail to see how it possibly could have denied the defendant a fair trial. The record clearly reflects that although the victim's credibility may have been a critical issue in the case, the testimony of S was invited by the defense, it was not severe, as it pertained to evidence already before the jury, the claim pertained only to one remark made in closing by the prosecutor and the court properly instructed the jury on the use of prior misconduct evidence. See State v. Williams, supra, 204 Conn. 540.

and attempted unsuccessfully to engage in sexual intercourse with her while the defendant cared for her at her mother's house in Poughkeepsie when she was between the ages of five and seven years old. The defendant argues that these allegations were vague, unsubstantiated and therefore overly prejudicial. We disagree.

"This court reviews evidentiary claims by an abuse of discretion standard." *State* v. *Lucas*, 63 Conn. App. 263, 273, 775 A.2d 338, cert. denied, 256 Conn. 930, 776 A.2d 1148 (2001). "The rules governing the admissibility of evidence of a criminal defendant's prior misconduct are well established. Although evidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior . . . such evidence may be admissible for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency. . . . That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material . . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 343, 904 A.2d 101 (2006). Our Supreme Court has instructed that evidence of a defendant's prior sexual misconduct in sexual assault cases is viewed more liberally than other types of prior misconduct. Id., 332 n.1.

Here, the court exercised sound discretion in admitting the evidence. Specifically, the court ordered a voir dire examination of the victim regarding her proposed

testimony on the prior uncharged misconduct outside the presence of the jury and heard argument from counsel before rendering a decision on the admissibility of the evidence. The court also made a specific finding that the evidence was admissible on the issues of motive and intent and made a detailed finding that the evidence was highly probative and material, and that its probative value outweighed the prejudicial effect. Furthermore, the court instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact.

With regard to the court's finding that the testimony was admissible on the issue of motive, *State* v. *James*, 211 Conn. 555, 560 A.2d 426 (1989), is instructive. In *James*, our Supreme Court explained that "[e]vidence of prior sexual misconduct with the complainant in a sexual assault case has commonly been admitted to show a lustful inclination toward the victim." Id., 578. "That the defendant had a particular sexual interest in [the victim] is certainly relevant to his motivation to commit the crime charged." Id. Citing *James*, the trial court determined that the victim's testimony that the defendant previously had committed sexual acts toward her was relevant and material on the issue of motive. We conclude that the court's reliance on *James* and its determination that the evidence was admissible were not an abuse of discretion. See *State* v. *Larkin*, 38 Conn. App. 125, 132, 659 A.2d 1211 ("the victim's testimony that the defendant had previously committed sexual acts toward her was relevant and material"), cert. denied, 235 Conn. 903, 665 A.2d 904 (1995).

With regard to the court's balancing test, the defendant argues that the allegations were remote in time and that the victim's accounts were vague and uncorroborated. "The remoteness in time of a prior incident is rarely, standing alone, determinative of the admissibility of such evidence; rather, it is one factor to be

considered by the trial court in making its decision." *State* v. *Kulmac*, 230 Conn. 43, 62, 644 A.2d 887 (1994) (despite seven year hiatus between prior misconduct and charged offense, court did not abuse discretion in concluding that misconduct evidence "was sufficiently recent to have probative value").

With respect to the defendant's claim that the accounts were vague, the record reflects that during the voir dire, the victim gave a specific account of the prior assaults, providing details that included the defendant's use of Vaseline, the location where the incidents occurred and a description of exactly how the defendant touched her. Moreover, notwithstanding that the defendant was unsuccessful in his attempts to engage in sexual intercourse with the victim on the uncharged occasions, the way in which he touched her on the prior occasions was very similar to the charged events and therefore highly probative on the issue of the defendant's intent, and the court noted that intent was at issue in this case. See *State* v. *Raynor*, 84 Conn. App. 749, 756, 854 A.2d 1133 ("[w]hen a trial court determines whether it will allow such evidence, it needs to examine the similarities between the prior conduct and the current crime" [internal quotation marks omitted]), cert. denied, 271 Conn. 935, 861 A.2d 511 (2004). Thus, the court did not abuse its discretion in determining that the probative value of the evidence outweighed its prejudicial effect. Under the totality of these circumstances, we therefore conclude that the court did not abuse its discretion by permitting the state to introduce the evidence of prior misconduct by the defendant. See *State* v. *Kulmac*, supra, 230 Conn. 63.

III

The defendant's final claim on appeal is that the court improperly permitted a state's expert witness to vouch for the credibility of the victim. The defendant argues

that because the expert had acted previously as a forensic interviewer and counselor to the victim, she was biased, and it was improper for her to be called as an impartial and detached witness to testify about the general characteristics of child sex abuse victims. The defendant also argues that because the victim was an adult when she testified, the expert's testimony regarding the general characteristics of child abuse victims was unnecessary.

"The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Citations omitted; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 634, 881 A.2d 1005 (2005).

At trial, the state called an expert, Lisa Bush, who testified that she is a licensed school psychologist who had been in practice for nineteen years, working primarily with adolescents. In addition, Bush testified that she is a contract forensic interviewer at a rape crisis center and has conducted approximately eighty to ninety interviews with children who presented claims that they had been sexually abused. In these roles, Bush testified, she had the opportunity to become familiar with the general characteristics of sexually abused children.

After the court qualified Bush as an expert, the defendant objected to Bush's testimony on the ground that,

to the extent the victim was older than age eighteen at trial, Bush's testimony regarding general characteristics of sexually abused children was irrelevant. The defendant also argued that Bush, who had conducted an interview with the victim in this case and prepared a report,[17] would improperly vouch for the victim's credibility. In response, the state argued that Bush would testify only as to the general characteristics of sexually abused children and that the state would offer no evidence to indicate that Bush had interviewed the victim. After hearing argument outside the presence of the jury, the court overruled the defendant's objection and allowed Bush to testify as to general characteristics of sexually abused children, but allowed the defendant a continuing objection to the testimony.

Bush then testified that children are more likely to be abused by someone they know over a long period of time. She also opined that if a child is sexually abused by a person whom they know, that child is more likely to make a delayed and only partial disclosure of the abuse. On cross-examination, defense counsel asked Bush whether she had conducted a forensic interview with the victim. The state conducted no redirect examination.

The defendant also claims that the court improperly permitted the state to use Bush, who had interviewed the victim as an expert, to testify on the general characteristics of sexually abused children. Essentially, the defendant's argument is that because Bush's testimony

---

[17] On March 19, 2007, the defendant filed a postargument motion seeking to amend his appendix to his appellate brief to include the report generated by Bush detailing her interview of the victim. The report was not part of the record before the trial court and therefore is not properly before this court. See Practice Book § 61-10. Moreover, the parties are in agreement that the interview occurred, which forms the basis for the defendant's claimed impropriety on appeal. Thus, the report itself is unnecessary for proper appellate review of the claimed impropriety. Accordingly, we deny the defendant's request.

about the way in which child sex abuse victims generally disclose the abuse closely mirrored the victim's trial testimony regarding what occurred in this specific case, Bush was clearly vouching for the victim's credibility. We disagree.

"[I]n cases that involve allegations of sexual abuse of children, [our Supreme Court has] held that expert testimony of reactions and behaviors common to victims of sexual abuse is admissible. . . . Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. . . . It is not permissible, however, for an expert to testify as to his opinion of whether a victim in a particular case is credible or whether a particular victim's claims are truthful. . . . In this regard, *we have found expert testimony stating that a victim's behavior was generally consistent with that of a victim of sexual or physical abuse to be admissible*, and have distinguished such statements from expert testimony providing an opinion as to whether a particular victim had *in fact* suffered sexual abuse." (Citations omitted; emphasis added.) *State* v. *Iban C.*, supra, 275 Conn. 635. "Thus, [our Supreme Court has] recognized the critical distinction between admissible expert testimony on general or typical behavior[al] patterns of minor victims and inadmissible testimony directly concerning the particular victim's credibility." (Internal quotation marks omitted.) *State* v. *Grenier*, 257 Conn. 797, 806, 778 A.2d 159 (2001).

Here, the defendant concedes that during direct examination, Bush made no specific reference to the victim, to having interviewed her or to any statements made to Bush by the victim, and never specifically indicated that she believed the victim's testimony. Further, the defendant has referred to nothing in the record that would indicate that Bush provided an opinion as to whether the victim had in fact suffered sexual abuse.

Compare *State* v. *Iban C.*, supra, 275 Conn. 636 (concluding that court abused its discretion by admitting into evidence expert's diagnosis of victim as sexually abused child); *State* v. *Grenier*, supra, 257 Conn. 812 (court abused its discretion by permitting two experts to testify that particular victim was credible). Moreover, the defendant has cited nothing in the record to support his claim that Bush made even indirect assertions to validate the truthfulness of the victim's testimony. See *State* v. *Iban C.*, supra, 635 ("even indirect assertions by an expert witness regarding the ultimate issue in a case can serve inappropriately to validate the truthfulness of a victim's testimony"); *State* v. *Grenier*, supra, 806 (discussing expert's testimony that her treatment of the victim was for " 'the trauma of the abuse that [she] experienced' " constituted indirect assertion that validated truthfulness of victim's testimony).

Thus, the defendant's argument rests on the assertion that the expert's testimony regarding the general traits of a victim of sexual abuse was consistent with the victim's behavior. We find nothing improper about the court's decision to admit the testimony for this purpose. See *State* v. *Freeney*, 228 Conn. 582, 592–93, 637 A.2d 1088 (1994) ("The sole purpose of the experts' testimony was to establish that the victim's behavior was generally consistent with that of a victim of sexual or physical abuse. . . . [W]e conclude that the admission of the expert testimony was within the trial court's discretion." [Citations omitted.]). Further, the defendant has cited no authority to support the proposition that the expert's testimony was improper because the expert had prior knowledge of the facts of the victim's particular case and had interviewed the victim in a capacity as a forensic examiner. Because the expert made no reference to the victim or her statement during

her direct testimony[18] or indirectly vouched for the victim's credibility during her testimony, we conclude that the admission of the expert testimony was within the trial court's discretion. See id.

With respect to the defendant's argument that Bush's testimony was irrelevant because the victim was an adult at the time of trial, that argument is without merit. It is not disputed that the victim's allegations involved assaults that occurred when she was between the ages of approximately seven and fourteen and that the disclosures to J in 2001, and S in 2003, occurred when the victim was a minor. Throughout the trial, defense counsel sought to capitalize on the victim's delay in reporting the incident as a child and the vagueness of such disclosures.[19] Thus, the testimony of the expert on potential causes of a delay in reporting and vagueness of disclosures made by child sex abuse victims pertained to knowledge not common to the average person and was helpful to the jury in considering the issues before it, namely, the defendant's sexual abuse of the victim and her disclosures of the sexual abuse, all of which occurred when she was a child. As such, the court's admission of the testimony was not an abuse of discretion. See *State* v. *Iban C.*, supra, 275 Conn. 634.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[18] Although Bush acknowledged that she had interviewed the victim during cross-examination, such acknowledgement was in response to a direct question posited by defense counsel, and her testimony was limited to the date and duration of the interview, without vouching for the credibility of the victim in any way.

[19] In closing argument, for example, defense counsel stated: "I won't deny there's something that she remembers from her childhood that, whether true or not, or whether she got it right or whether she got it wrong, that she told [S] and his mother in and around 2002, which would have been, I guess, five years—five years later, thereabouts, but that's all she told them. [The prosecutor] is talking about, well, you know, the credibility of [the victim], and he'll get into it, but until the night of the beef when she allegedly told her mother everything when they were alone, she had never mentioned anything at all about [the victim's prior residences in Bridgeport] or any

other address to anybody in—regarding that. So, the only—the only thing she ever mentioned in all those years was this incident in Poughkeepsie."